No. 53.—JAMES S. BEALL, heir at law, plaintiff in error, *vs.* JOHN H. MANN, executor, &c. defendant.

[1.] The usual mode in which assent to a will is manifested, is by subscribing it, or acknowledging the signature in the presence of the witnesses, and ordinarily, the execution would constitute sufficient evidence of the testator's knowledge of its contents.

[2.] The presumption is strong against a party preparing a will, who takes a benefit under it, and although it will not be declared void on that account, strong evidence of intention in such case, will be required.

[3.] In an issue of *devisavit vel non*, the Court will not remand a cause for a rehearing, notwithstanding the irregularities committed on the trial—being satisfied from the testimony, that justice has been done, especially if the provisions of the will furnish intrinsic evidence of its reasonableness, and the Court and jury, on the trial below, concurred in opinion, both as to the capacity of the testator, and the fairness of the will.

[4.] For the Court to announce at the close of the testimony, that its mind was fixed and unalterably made up, upon the merits of the case, and then to arrest the argument before its conclusion, is an unwarrantable interference with the rights and privileges of both counsel and jury.

[5.] The Court has the power to express to the jury its opinion upon the facts, but to its exercise there are assignable limits, and in a doubtful case, this infringement upon the peculiar province of the jury, would constitute sufficient ground for a new trial.*

*Caveat to Will*—Tried in Cass Superior Court, before Judge WRIGHT, August term, 1848.

The facts are incorporated at large, in the opinion of the Court.

McDONALD, for plaintiff in error.

In arguing this case, I want it to be kept in mind—

1st. That the will was written at the house of John H. Mann.

2d. Tha it is in his hand writing.

3d. That there was no one there except Mann, the testator, and the servant of the latter

4th. That he came to Mann's house in extremely bad health, and the will was executed within a little more than twenty-four hours after his arrival.

---

*See *Supra—Holder vs. the State.*

Beall *vs.* Mann.

5th. That he had written a will with his own hand, with which he was satisfied but a few days before.

6th. That there was no evidence that the testator knew the contents of the will.

In such a case there must be proof of the knowledge of the contents of the instrument. When the person who prepares the instrument, or conducts its execution, is himself benefitted by its dispositions, evidence of the signing alone will not be sufficient, but the proof must go to the knowledge of the contents of the instrument. 1 *Williams' Ex.* 219. There must be very clear proof of volition and capacity, as well as of a knowledge of the contents of the instrument. *Ib.* 63. So stringent was the rule of the Civil Law, that *qui se scripsit heredem,* could take no benefit under the will. There cannot be too great a security against fraud in making wills. The rule of the Civil Law is the only safe one. It effectually prevents fraud by writers of wills, in their own favor. Another rule of the Roman law, for the security of testaments, was that the name of the heir should be expressed, by the hand writing of either the testator, or of the witnesses. "*Ut per manus testatoris vel testium, nomen heredis exprimatur.*" *Lib.* 2, *tit.* 10, *section* 4, *Justinian's Institutes.* Such a regulation gives an assurance, that the testator will, in all cases, know the contents of the testament, and effectually protects him against imposition. The rule of the English Law is less stringent. By the Civil Law, if the writer took a benefit under the will, it was void, whether the testator knew the contents or not; by the English Law, he may take the benefit, provided he can prove that the testator knew the contents of the will. This constitutes the only difference between the codes. By the Roman Law, the will of Stallings is void. By the English Law, it is equally so, unless a knowledge of its contents can be brought home to the testator. No part of the proof is such as to warrant the inference, that the contents were known to him. Every thing that he said at the time of the execution of the will, and the fact that the will was on his bed when the witnesses came in, and the declaration that he had been making his will, are perfectly consistent with a total ignorance of its contents. It is nothing more than what a testator in ordinary cases would do, and in ordinary cases, cases in which the legatee is not the writer of the will, it is sufficient. But if a legatee write a will, the law of England requires that the proof

should be clear and decisive. The balance must not be left *in equilibrio*; the proof must not merely go to the act of signing, but to the knowledge of the contents of the paper. In ordinary cases this is not necessary, but the person who prepares the instrument and conducts the execution of it, is himself an interested person, his conduct must be watched as that of an interested person. *Pashe vs. Ollat,* 1 *Ecc. Rep.* 273.

The law is extremely jealous to protect the unwary against undue influence and control. Where the relation of confidence exists, and the party frames the instrument for his own advantage and benefit, every presumption arises against the transaction. It is not necessary to prove fraud and circumvention; he must remove the presumption by clear and satisfactory proof. 3 *Eng. Eil. Rep.* 172, 174, *Ingram vs. Wyatt.*

There ought to be evidence going distinctly to show the nature of the testamentary acts, something going distinctly to their nature and contents, in order for the circumstances to supply the want of instructions, and the absence of explanations at the execution. Less than this will not be sufficient to supply the demands of the law, and to overcome the suspicions attaching upon the instructions. 3 *Ec. Rep.* 200.

In this case, the Court pronounced against the will. Upon this judgment an appeal was prosecuted to the delegates. It was held under consideration there, from the 20th January, to 8th July, and the Court were, on the latter day, equally divided in opinion, and no sentence was pronounced. 5 *Ec. Rep.* 183. After other judges were called in, the sentence of the Court of Prerogative was reversed. The Court of Delegates did not disaffirm any of the principles of law laid down by the Judge of the Court of Prerogative. *Ib.* 184. They thought the facts warranted a different conclusion. There was evidence which went very far to prove a knowledge of the contents of the will. In fact, the testator referred directly to what he had done in his will. Speaking of Henry Wyatt, the legatee, the testator remarked, "if he wants money now, he wont want it when I am gone." At another time he said, "I have made Henry quite independent of his father, and every one else," and again he said, "his father has not much to leave him, but I have taken care of him. 3 *Ec. Rep.* 201.

The Lord Chancellor, before whom a petition was presented

for a Commission of Review of the decision of the Court of Del-
egates, said that unless he could be satisfied that the principles
of law on which that Court decided were wrong, or that the facts
were mis-stated, or misunderstood, he could not recommend the
Crown to grant a Commission of Review ; a doubt was not suffi-
cient, he must be convinced that they were clearly wrong.   He
said also, that the testimony had raised doubts in his mind, that
nothing that he had heard had removed.   5 *Ec. Rep.* 185.

Where a paper has been drawn up by a person for his own
benefit, or where he takes a considerable benefit under it, the pre-
sumption lies strongly against the act, and it requires to be pro-
ved by satisfactory evidence, dehors the instrument, that it was a
free and voluntary act of a capable testator, and executed with
a full knowledge of its contents and effects.   6 *Ec. Rep.* 409.
The probability of the testamentary dispositions will not aid the
case, for the party confided in, who wished to practice an impo-
sition for his own benefit, would draft the instrument according
to such probability.   He might even acquaint himself with pri-
or declarations of the party, so as to mould the instrument in
conformity to them, while the testator himself may have aban-
doned his previously declared purposes.

In the case of *Barry vs. Butlin*, the Court reviewed the author-
ities on this subject, and recognised the rule, that there are cases
of wills prepared by a legatee, so pregnant with suspicion that they
ought to be pronounced against in the absence of evidence in their
support, and that extending to clear knowledge of the contents
by the supposed testator, and that instructions proceeding from
him, or the reading over of the instrument by or to him, are the
most satisfactory evidence of such knowledge.   6 *Ec. Rep.* 418.
One of the cases of such wills, so pregnant with suspicion, is
where the legatee takes a considerable benefit under it.

In the case of *Barry vs. Butlin* above referred to, there was
proof of capacity and intention or volition, and of a circumstance
which led to the necessary conclusion, that he knew the contents
of the will.   The testator sent to desire a witness to come and
see him execute his will.   One of the witnesses testified that the
testator declared it to be his last will and testament, and reques-
ted him to witness it.   The draft of the will, in a page of it, is
twice altered in the hand writing of the testator, " which," the
Court remarks, " distinctly proves his mind was employed on

the subject, and affords ˙reasonable evidence that he was cognizant of the contents." *Ib.* 421. In the case of *Stallings*, he made no remark in respect to the contents of his will, or the dispositions he had made of his property, nor is there proof of an alteration of the will in his own hand writing, or of the slightest circumstance, that he knew the contents of the will.

In the case of *Barry*, the will was executed on the 14th September, 1827. *Ib.* 407. Testator died 13th March, 1833. The deceased went to the draftsman of his will in his own carriage, openly and unattended by Whitehead, one of the principal legatees. *Ib.* 416.

Mr. Stallings, during his last illness, made a will with his own hand, with which he is satisfied. He leaves home, goes to Augusta, to the house of the writer of the will, is there alone with him. and in little more than twenty-four hours, a will is executed, giving the writer a considerable legacy, and there is no proof that the testator knew the contents of the will.

The onus of the proof may be increased by circumstances, such as unbounded confidence in the drawer of the will. The greater the confidence, the more clear and satisfactory should be the proof. *Pashe vs. Ollat*, 1 *Ec. Rep.* 273. This is a rule founded in reason, for the greater the confidence, the less probability that the testator would require the will to be read. For a stranger to draw a will, there·being no confidence, the testator would demand a reading of it.

In the case of *Raworth vs. Marriott*, the same principle is recognised. In that case, the confidential attorney of the testator drew the will ; he was one of the residuary legatees, and received also, a pecuniary legacy. An issue of *devisavit vel non* was made and the will was sustained. The evidence is not given, nor is it to be further inferred, than that there was no direct ˙ evidence· that the testator knew the contents of the will, but that there was *circumstantial* evidence that he did. It was contended on one hand, that the fact could be proven by direct evidence only, while on the other, it was insisted that where a testator was of sound and disposing mind, and executed a will, the law presumed that he was cognizant of the contents. But the Master of the Rolls declared that it will be the duty of the Judge who tries the validity of such a will, to call the attention of the jury to the particular circumstances, and to state to them that the testator knew the contents

of the will; but it will not be the duty of the Judge to state to the jury, that they must come to that conclusion upon direct testimony only, and that they must exclude from their consideration, all circumstantial evidence. 7 Eng. Con. Ch. Rep. 200, 206.

The Court erred in instructing the jury in matter of fact. *Tucker vs. Tucker*, 1 *Kelly*, 235. *Stell, Guardian, vs. Glass*, Ib. 486–7.

Hooper & Peeples, representing Akin, for defendant.

*By the Court.*—Lumpkin, J. delivering the opinion.

James G. Stallings, for some years past a citizen of Cass county, in this State, reached Augusta, in bad health, on the twelfth day of August, 1847, and took up his abode with John H. Mann, a relative by marriage. He executed his will at 8 o'clock on the morning of the ensuing day, and died four days thereafter. The following is a copy of his will: "In the name of God, Amen! I, James G. Stallings, of the county of Cass, in said State, being of sound mind and memory, make this to be my last will and testament, to-wit: First, I will that all my just debts be first paid. Secondly. I give to my friend, John H. Mann, my old woman Belah, her daughter Lucinda and Lucinda's children, Daniel, Sophy, Dicey, Henry and her infant, and my sorrel mare and buggy. I also give him the future issue of the females. Thirdly, I give to my cousin, Charlotte Stallings, my old woman Becky, her daughter Sarah, and Sarah's children, Becky and Anderson, and the future issue of the females. Fourthly, I give to my cousin Harriett, the wife of George W. Terrentine, during her life, my negroes Henry and Monday, and to be held by the said Charlotte Stallings, in trust for her sole and separate use during her life, as aforesaid; and after her death, I give and bequeath said negroes to said Charlotte Stallings, to her and her heirs forever. Fifthly, I will that all the rest and residue of my estate be sold by my executor, at public or private sale, my negroes choosing their owners, to be approved by my executor, and the proceeds arising from said sale, I give and bequeath to my nephew James S. Beall, upon the following trusts: *in trust* for my two nieces, the sisters of the said James S. Beall, Valinda Towns and Elza Townsend, to be divided equally between them, during their respec-

tive lives, and at their deaths, their portions respectively to be held by the said James S. *in trust* for their children, respectively, share and share alike, until they marry, or arrive at lawful age. Sixthly, I give to the Trustees of the Methodist church in Augusta, fifty dollars, to aid in purchasing or building a parsonage house. I also give to said church fifty dollars, to be paid to and used by the preacher in charge at his own discretion. Seventhly, I give to my cousin Catherine Beall, my old family gold watch and sleeve buttons. I hereby nominate, constitute, and appoint my friend, John H. Mann, to be executor of this, my last will and testament," &c. The will was signed and sealed by the testator, and attested in proper form by three subscribing witnesses, namely, Lewis A. Dugas, James M. Moody, and Charles McCay.

On the 24th day of August, 1847, it was proven at Chambers before I. P. Garvin and W. V. Beall, Justices of the Inferior Court of Richmond county, upon the oath of James M. Moody, one of the attesting witnesses. And at the September term. 1847, being offered for record, before the Inferior Court of Cass county, when sitting for ordinary purposes, James H. Beall, an heir at law of the testator, entered his caveat against the record thereof, upon the grounds—

1st. That James G. Stallings at the time of making said will, was not of sound and disposing mind and memory.

2d. Because James G. Stallings did not execute the will.

3d. Because James G. Stallings was imposed on by the false and fraudulent representations of John H. Mann, principal legatee named in the will, of, and concerning the character and conduct of the caveator, and was thereby unduly induced and influenced to disinherit the caveator.

4th. Because, if the testator executed the will, it was done from the over-persuasions and importunities of John H. Mann, and his friends, to obtain quiet and repose, being at the time at Mann's house.

5th. Because, the mind of the testator, at the time of executing the will, was exceedingly imbecile and weak, and divers fraudulent practices were employed to induce him to make this bequest and unreasonable disposition of his estate.

6th. Because the will is not sufficiently proven in law to authorize the same to be recorded, or letters testamentary to be granted thereon.

The record before us does not disclose what further proceedings were had before the Court of Ordinary, except that the caveat was traversed,in each and every particular, by the counsel of John H. Mann, the executor and propounder of the will.

On the 9th day of August, 1848, the cause was called and submitted to a special jury-trial in the Superior Court, when Mann offered and read to the jury the depositions of the three subscribing witnesses to the will, taken by commission.   Dr. Dugas testified that he saw the testator sign the will, that he attested it as a witness in the same room, and directly in his view : that when he called on Mr. Stallings that day, as his attending physician, he said—" *Doctor, I have been making my will*—I have been intending to do so for some time, and concluded to get it off my mind." After some further conversation on the subject of making wills, witness prescribed for the deceased, and was about taking his leave, when the deceased requested him to wait till other witnesses could be called in.   Mr. Mann then went out and brought in the other witnesses, and the instrument was executed—Stallings acknowledging it to be his last will.   Witness remarked that such acknowledgment was necessary.   One of the other witnesses, he thinks Mr. Moody, inquired if it was not necessary that it should be read ?   Mr. Stallings replied that it was sufficient that he acknowledged it to be his will.   Some other conversation ensued, of a general character, when witness withdrew.   No influence, threats, entreaties, persuasions, inducements, or anything of the kind, were used, so far as witness knows or believes.   He saw and heard no fraudulent practices, by John H. Mann, nor any one else.   Mr. Stallings signed the will freely and voluntarily. When the other witnesses entered the room, Mr. Stallings was in a semi-reclining position, propped by pillows, in his bed.   The will lay on the bed as it had done from the time he entered the room— no one else was in the room—witness was his sole attending physician during his last illness, after reaching Augusta.   At the time the will was executed, testator was perfectly sane, but much concerned about his spiritual welfare and condition, to which he often alluded.   He was fully conscious of what he was doing, and competent to the proper discharge of ordinary business, before and after the will was made.   He saw no evidence of mental aberration.   He lived four days after signing the will, and his mind never wandered till three or four hours before his death.   He

spoke on business matters with entire coherence and intelligence, and referred to transactions between witness and himself, in his usual manner. When witness first came into the room, the testator was alone, and the will and other papers were by him, on the bed, *as though he had been examining them.* He was called to see Mr. Stallings, on the day previous to the making of the will, when he first reached the city. The paper is in the hand-writing of John H. Mann, and was executed in his house. It was not read in the presence of witness. Mr. Stallings died in Mann's house; witness saw him several times a day; when he first visited him, he was very much debilitated, but able to walk. He usually remained with him as long as he could, conversing on general topics, sometimes on religious subjects. Mr. Stallings was feeble in body, when the will was signed, but not in mind, so far as he could discover. He could walk from one room to another, with assistance, two days before his death. During the time he was with him, when the will was executed, he remained in the same position, except that he raised himself up, without difficulty, to sign the will, which he did on a book that was handed him for that purpose. He stated to witness that he came down the Rail Road, to see whether he could not do something for him, as he was declining daily while he remained in the up-country. Mr. Mann's white family were in Cass county, at the time. Deceased's disease was disorder of the stomach and bowels, of which dyspepsia was the origin. He seemed entirely calm when he executed the will, and witness saw no symptom of a troubled mind, during his sickness, except upon religious subjects. He has known Mr. Stallings for ten or twelve years. During his last illness, he conversed with him frequently about his planting interest, and his affairs in general. He was concerned about his future state, but it did not affect at all the clearness of his mind. There was no sign of derangement, except within a short period before he expired, which is usual with dying persons.

McCay confirmed, in every particular, the testimony of Dr. Dugas. He was passing down the street to market, and was called in by Mr. Mann, to attest the will. When he came into the room, he found the testator and the Doctor alone, and the will and other papers lying on the bed, as already stated. He heard Mr. Stallings say, sometime before his death, that he meant

to sell his property in Cass, and return to Richmond county, where he formerly resided. Mr. Moody, also, corroborated the proof as before rehearsed. He stated that the testator, during the time the party were present, took part in the conversation upon general topics, and he deemed him capable of transacting any ordinary business. During the previous winter or spring, Mr. Stallings was at Mr. Mann's house, in Augusta, in bad health. He frequently called at the store of witness, and stated that e intended selling out in Cass, and returning to Richmond—and that if he could not dispose of his place there to advantage, he would give it to Mr. Mann's son James, if he would live there; that Mr. Mann's family were nearer to him than any relatives he had, and that he could not receive the attention in the up-country that he could in Augusta, on account of the absence of Mr. Mann's family, who had been in the habit of attending on him when sick. He was called from his store, which is under Mr. Mann's dwelling-house, and where he was attending to his usual business, to witness the will. The deceased raised himself from the pillow, to sign the will, and then laid himself back again, in which position he remained until he left the room. Witness, in a conversation with Mr. Beall, the caveator, told him that the legacy given to Mr. Mann, was probably intended as compensation for the care taken of the testator by Mr. Mann and his family, from time to time, when he was sick—that he was surprised he had not given them more, *for that it was generally believed that he would leave them the bulk of his property.*

The testimony being closed, on the part of the propounder of the will, Dennis Dent, James Dent, Thomas Whitsell and ——— Brown, were examined by the caveator. Dennis Dent stated that he had been acquainted with James G. Stallings, for forty years, but having lived out of the State for thirty years past, he had only seen him occasionally during that time. He is acquainted with his legal heirs, viz : James S. Beall, Jane Jones, Valinda Towns and Eliza Townsend. James S. Beall is the nephew of James G. Stallings, being the son of his half-sister, Eliza, who married Rinson D. Beall, the father of James S. Beall, and the other three sons. He never had any conversation with him respecting the disposition of his property. They were intimate in early life. Last time witness saw him, was at his house, in July or August, 1835. James G. Stallings had other persons standing

in the same relation toward him, as those already mentioned, viz: Elias Stallings and Keziah Stallings. He does not know whether either of them be living, or if dead, whether they left any heirs. Caveator's mother was sister of the half-blood, on the father's side, to deceased. Mrs. Mann, Charlotte Stallings, and Harriett Terrentine, formerly Harriett Stallings, were cousins of the testator, as witness has always understood. James S. Beall's father was the brother of witness's wife; witness has resided in Tuscaloosa, Alabama, for twenty years, and has not seen the testator for the last five years.

James Dent has known the testator since 1805, and was intimate with him from 1830 up to the last time he saw him, in September, 1846. He knows the heirs at law of the deceased, viz: Capt. Elias Stallings, Keziah Stallings, (if alive,) James S. Beall, Jane Jones, Valinda Towns and Eliza Townsend. In the years 1840 and 1841, he spoke often with James G. Stallings, touching the disposition of his property. He invariably declared his intention of devising his property to Valinda Towns and Eliza Townsend, who he said stood more in need of it than any of his relatives, except one negro whom he proposed leaving to Charlotte Stallings; at the same time he stated that he would make John H. Mann and James S. Beall, his executors. He expressed the same purpose, as it regards his effects, in 1843. When he visited him, when he last saw him, in 1846, he said nothing about his property. The conversations which witness held with the deceased were mostly during their morning and evening walks on the plantation, when no one was present. Deceased was a kind and humane master, and did not manifest any particular anxiety about the disposition of his property after his death.

Thomas Whitsell swore that he became acquainted with the testator in 1845, during his visit to Dooly county, where he spent some ten or fifteen days. That he had repeated talks with him during that time, but did not know him previously. He came to purchase land—spoke of James S. Beall as his nephew, and said he would buy provided James S. Beall would take charge of the hands, which he proposed sending down; observed that he might as well be troubled with them as himself, for that he expected to give him his property *any how.* He said nothing about making a will. Witness lives about 2¼ miles from James S. Beall.

Brown testified that the family of John H. Mann were at the

house of Stallings in Cass county, when he died; that Stallings left there a short time before he died, very sick; that Mrs. Mann seemed very anxious for him to get off, stating that Dr. Young advised it; that deceased had twenty-nine negroes in Cass county, and that his land there was worth three thousand dollars. He was overseer for the deceased, but cannot estimate the value of his estate. He understood that he owned other negroes below.

As rebutting testimony, Wm. Bell was introduced, who stated that some four or five days before James G. Stallings went to the up-country the last time previous to his death, he desired witness to get Robert Clark, Esq., to come and draw his will, and to be present as a witness himself. He stated that he wished to leave Lucinda to Hannah, (meaning the wife of John H. Mann, whom he usually so called,) that he did not wish the woman and her family scattered, and expressed regret that he had not left them with Mrs. Mann when he sent them to the up-country; he said he wished his will made at once, for that he might grow worse, and be out of his proper mind. Witness missed seeing Mr. Clark, and Mr. Stallings left without making his will. At a previous time when he first returned from a trip to the up-country, he said he was sorry he had sent Lucinda up—wished he had left her with Mrs. Mann, and said he would not have sent her up but on account of her son Daniel, whom he could not do without, and he was unwilling to part him from his mother; that if he had expected to come down so soon, he would not have sent them up. He has often heard Mr. Stallings speak of Mrs. Mann, (whom he usually called Hannah,) as his favorite relative. He said he always hated to leave her house. *This was a common remark.* These things transpired in 1845 and 1846, when witness lived with deceased as overseer. He recollects nothing more except hearing Mr. Stallings say, that when he had got fixed in Cass, he intended getting Mrs. Mann to spend her summers there, if he could. He has known Mr. Stallings for twenty years; as already stated, he lived with him in 1845 and 1846, and near him in Richmond county in 1847. When he moved to Cass, witness went with him in charge of his negroes. For fifteen years or more, he seldom visited Augusta without stopping one night, or longer, at testator's house; witness residing in Columbia, some twenty miles above. Mr. Stallings frequently staid with his family at the house of witness.

Dr. Robert M. Young, in support of the will, swore that he was

Beall *vc.* Mann.

the attending physician of deceased, during his last illness in Cass, that he was very sick, and had been so for some time. He had frequently before been benefitted by riding on the Rail Road, and witness advised him to take a trip to Atlanta, and to make an excursion up and down the State Road. He accompanied him in this tour. Instead of getting better, he became worse. He rested badly the night they arrived at Atlanta, witness went to the Stone Mountain—Mr. Stallings was to tarry till he returned. When he got back, he found he had departed for Augusta. He mentioned that he wanted to go to Augusta to arrange his affairs, for he could do it better there than any where else. He expressed, likewise, a desire to see Mr. Mann. He considered his disease an ulceration of the mucous membrane of the stomach and bowels, of which he died. On one occasion when he visited Mr. Stallings, he had a paper before him, and wanted witness to stay and attest it, and other persons were to come in for that purpose. He remained a while, but no one else coming, he left, and does not know whether the will was executed or not. This occurred a short time before he left Cass county the last time. He left home finally, at the instance and by the advise of the witness, who urged him to go, even if it should be raining a little. On the morning he left, he came to the house of witness in a buggy, and went from his house to the Rail Road in his, witness's carriage.

The testimony being closed on both sides, the Court discharged the jury until the next morning, and upon the announcement that four counsel would argue the case, the presiding Judge remarked, "*that his mind was made up, and that the combined eloquence of the world could not change it;*" but that he would not say cn which side it was made up. On the day following, one of the counsel for caveator addressed the jury, who was followed by one of the counsel on the other side. The concluding argument against the will having been submitted, and the attorney, in reply, being about to address the jury, was stopped by the Court with the remark that "*it was unnecessary.*"

Counsel for the caveator requested the Court to charge the jury, 1st. That inasmuch as John H. Mann wrote the will, and took a considerable benefit under it, the presumption of law is against the act, and that they must be satisfied by evidence *dehors* the instrument, that it was the free and voluntary act of a capable testator, and executed with a full knowledge of its contents and

and effect.    2d.    That as the testator reposed such entire confidence in Mr. Mann, the draftsman of the will, clearer proof should be produced by him that Stallings knew its contents.

The Court charged the *first* principle to be law.  As to the *second* instructions prayed for, he refused to give them.  On the contrary, he was of the opinion "that sufficient evidence had been adduced, already of the fairness of the will ; that it was not necessary to the validity of the will in this case, that it should have been read over to the testator in the presence of the witnesses."  The Court further "gave it as *its opinion* that not the slightest evidence had been adduced of fraud in the procurement of the will; that it was, however, the privilege and *the duty* of the jury, if they thought differently, so to find."  To which proceedings and charge of the Court, the caveator, by his counsel, excepted.

[1.] In the case of *Gryle vs. Gryle*, 1 *Ves. Jr.* 11, Lord Hardwick doubted whether it was a sufficient execution, and publication of a will, for the testator to say before the witnesses, "this is my will," without some further act on his part.  But those doubts have long since vanished, and modern adjudications have gone to the extent of deciding that a will is duly executed and published, though the witnesses neither saw the testator's signature, nor were made acquainted with the instrument, they attested, provided they were requested by the testator to subscribe the memorandum of attestation.  *British Museum vs. White*, 3 *M. and Pay.* 689.  *S. C.* 6 *Bingh.* 310.  *Wright vs. Wright*, 5 *M. & P.* 316.  *S. C.* 7 *Bingh.* 457.  *Johnson vs. Johnson*, 1 *Cromp. and Mees.* 140.

[2.] But to this general principle, there is an important qualification, which is this : That while it is true, that where a testator, of sound and disposing mind, executes a will, the law presumes that he was cognizant of the contents.  Yet, if the draftsman of the will takes a considerable benefit under it, the transaction will be viewed with extreme jealousy, and the jury must, in that case, be satisfied that the testator knew the contents of the will.  Direct proof is not absolutely necessary.  They may come to this conclusion upon circumstantial evidence.  *Paske vs. Ollat*, 2 *Phill.* 325.  *Ingram vs. Wyatt*, 1 *Haggard*, 394.  *Barton vs. Robins*, 3 *Phill.* 455, note.  *Billinghurst vs. Vickers*, 1 *Phill* 187.  *Wood vs. Wood*, *Ib.* 387.

By the Civil Law, if·a person wrote a will in his own favor, the instrument was rendered void. *Dig. Lib.* 48, *t.* 10, *s.* 15, *and Lib.* 34, *t.* 8. Unless the name of the heir was expressed by the hand writing either of the testator or of the witnesses. *Sed his omnibus a nostra constitutione propter testamentorum sinceritatem, ut nulla fraus adhibeatur hoc aditum est, ut per manus testatoris vel testium, nomen hæredis exprimatur, et omnia secundum illius constitutionis tenorem procedant. Lib.* 2 tit *X,* §4.

By the law of England, as adopted in this State, a less stringent rule has been established. Still, it is unquestionably true, that Courts here, will look with suspicion upon testaments of this character. The presumption is strong against an act done by the agency of the party to be benefited, especially where the capacity of the testator, at the time the will was executed, was in any degree doubtful. The Courts will not presume fraud, but they will, under such circumstances, require strong proof of intention.

[3.] We have here the concurrent opinion of the Judge and jury, who tried this cause, in favor of the will. The intrinsic evidence furnished by the provisions of the will itself, are in its favor, and we see nothing in the proof to cast the slightest shadow on its fairness; unless therefore, the law has been violated by the misdirection of the Court, we should be inexcusable for disturbing the verdict and judgment which have been rendered.

[4.] In the opinion of this Court, the declaration of the presiding Judge on the closing of the testimony, connected with the subsequent act of the Court, in arresting the progress of the argument upon the facts to the jury, was irregular and an improper interference with the rights, as well of the counsel as of the jury. It is the privilege of all parties, under the constitution of the State, to be heard in the prosecution and defence of their rights, personally, or by attorney, and it should not be disparaged or discouraged. Knowing and feeling as *we* do, how indispensable full and free argumentation is, to the ascertainment of truth, we are unwilling to sanction any conrse of proceedure calculated to repress it.

As to the direct charge, we see nothing in that to warrant a reversal. The Court recognised the doctrine upon which counsel for the caveator rested the case. The Judge was requested to instruct the jury, that clearer proof ought to be produced of the

fairness of the will. Even if such had been his opinion, it would have been error to have so stated. In *Aylwin vs. Vilmer*, 12 *Mass. R.* 22, the judgment of the Court of Common Pleas was reversed, and a *venire facias de novo* awarded, because the charge was calculated to make the jury understand, that the evidence offered was wholly insufficient. Perhaps it would have been better, to have simply declined giving the charge asked, without adding, that further evidence need not be adduced, of the fairness of the will. This seems like undertaking to judge for the jury, and almost amounts to a declaration to them, that any consideration of the evidence was wholly unnecessary. We apprehend, however, that the Court meant to say only, what is more definitely stated in the remark which followed, namely, that it was not necessary to the validity of the will in this case, that it should have been read over to the testator in the presence of the witnesses, and that they *might* find a verdict for the propounder of the will, in the absence of such direct proof.

[5.] The Court, in its charge, gave it as *its opinion*, that not the slightest evidence of fraud in the procurement of the will, had been proven. In *Stell* and *Glass*, 1 *Kelly*, 475, the question is discussed, as to the respective province of the Court and jury in the trial of causes, and a rule attempted to be educed, which would approximate as near to accuracy as the nature of the subject would admit of. And it was this, that every charge should distinguish clearly between the law and the facts, so that the jury cannot misunderstand their rights, or their duty, nor mistake the opinion of the Judge upon matters of fact, for his direction in point of law. This distinction is all important, and we think could not have been misapprehended by the jury on the trial of this case. There was nothing in the observation which fell from the Court, that could have made the impression on their minds, that by law, they could not on the evidence before them, have found a verdict for the caveator. But still further to guard them against mistake, the Judge very properly reminded them that it was not only their *privilege*, but their *duty* to find differently from *his opinion*, if they saw fit.

We doubt whether it would be wise, even in the Legislature, to alter the law as it now stands. And yet we are quite clear, as we have heretofore declared, that it is altogether better that Judges should come short of, rather than transcend their powers,

in expressing their opinion on the testimony.  And to this right there are limits although it is not very easy to assign them with accuracy.  In case of doubt, I would make this infringement on the privileges of the jury, sufficient ground for granting a new trial.  But being entirely satisfied that justice has been done in this case, we are unwilling to remand this cause for a re-hearing.

Judgment affirmed.