## WOODSON *v.* HOLMES.

1. In no case will this court reverse a judgment refusing to direct a verdict.
2. While the refusal of a motion to strike portions of a caveat which are wholly unsupported by evidence may not be error requiring a reversal of the judgment below, the trial judge should so instruct the jury as not to mislead or confuse them as to their duty in passing upon those portions of the caveat.
3. In such a case it is error for the trial judge to read in detail to the jury the unsupported allegations of the caveat, informing them that these contentions form the issues which they are to try.
4. While in a proper case a judge may suggest an amendment to pleadings, yet, where counsel is addressing the jury, he should not, after stopping the argument on the ground that there are no pleadings upon which to base the contention being made, thereafter say that counsel might amend and then proceed with the argument, — particularly where such suggestion might be construed as an intimation of what has been proved, or create upon the minds of the jury the idea that the court believes that the truth of the disputed issues of fact is with one side or the other.

5. The rule of law that where a party preparing or procuring a will takes a large beneficial interest thereunder, stricter proof than usual is necessary to show knowledge of the contents of the will on the part of the testator, has no application in a case where the only interest taken by the party alleged to have procured the will was his appointment as executor without bond or the necessity to make returns, and the provision for the payment of a debt due to him by the estate of the testatrix, the evidence of which he already held ; and where it appears that such person did nothing to suggest or instigate the making of the will, but acted only in furtherance of the expressed wishes of the testatrix.

Argued November 20, 1902. — Reargued January 21, — Decided February 6, 1903.

Probate of will — appeal. Before Judge Reagan. Pike superior court. June 7, 1902.

*E. F. Dupree* and *F. C. Foster*, for plaintiff, cited Civil Code, §§ 3276, 3260 – 1; 1 Wms. Exrs. (R. & T. ed. 1895), 164 – 6, 311, 414; Jar. Wills (R. & T.), 67 – 69, 133; Schoul. Wills (3d ed.), § 255 a; Page, Wills, §§ 413 – 15; 6 *Ga.* 325, 359 – 60; 21 *Ga.* 567, 572 – 3; 53 *Ga.* 678; 59 *Ga.* 472; 60 *Ga.* 194; 69 *Ga.* 82.

*J. F. Redding*, for defendant, cited Civil Code, § 3276; 12 *Ga.* 69; 24 *Ga.* 330; 26 *Ga.* 697; 30 *Ga.* 102; 53 *Ga.* 683; Schoul. Wills, § 584; Page, Wills, § 535.

CANDLER, J. A paper purporting to be the will of Mrs. Annie F. Holmes was offered for probate by W. D. Woodson, who was therein named as executor. J. F. Holmes, husband of the testatrix, filed a caveat on the grounds, (1) that the instrument was not the will of Mrs. Holmes, "because she did not execute, make, or sign said will, and died without executing any will;" (2) that it was not the will of Mrs. Holmes, because she did not execute it freely and voluntarily, and if it was ever executed by her she was moved thereto by undue influence exerted over her by her sister, Mrs. M. F. Woodson; (3) that it was not her will, because she was led to believe that she was indebted to Charley Woodson (one of the legatees in the will), when such was not the case, and no necessity existed for her to provide for the payment of such a debt; (4) that improper influence was exerted over her by Mrs. M. F. Woodson, "and by the representation that he (?) had contributed largely towards the payment of insurance and taxes on her house and lot in Barnesville, which representations were made to induce her to make provision therefor or the payment thereof, which representation misled and influenced her against her will, for no such facts

existed, except for a very small sum ; " and (5) that at the time of the execution of the alleged will Mrs. Holmes was in the last stages of consumption and was not of sufficient mind and reason to dispose of her property.     By amendment the caveator averred, " that said will is void for the reason that W. D. Woodson fraudulently changed the papers of Mrs. Annie F. Holmes by making an additional provision that he should not account to any one as executor, and should make no return to court of his acts and doings, and should have the right to sell said house and lot at private sale, which Annie F. Holmnes never contemplated or desired or knew," and that " such alterations secretly made makes said will void." After the conclusion of the evidence, and while addressing the jury, counsel for the caveator argued that the evidence failed to show that Mrs. Holmes knew the contents of the paper offered for probate as her will.     The court, of its own motion, called the attention of counsel to the fact that there was nothing in the pleadings to warrant this contention, and suggested that the caveat be further amended so as to embody such a ground, expressing in advance a willingness to allow such an amendment.     In pursuance of this suggestion, counsel for the caveator amended his pleadings by adding the ground " that said paper is not the will of Annie F. Holmes, for that if she signed said will she did not know the contents of said will and did not assent to them, and did not have any knowledge of the contents of said will."     The questions now under review were passed upon by the superior court of Pike county, to which court the case was taken on appeal from the court of ordinary.     The following may be taken as clearly established by the uncontroverted evidence introduced on the trial :

The decedent's home was in Pike county.   At the time the paper óffered for probate as her will was signed, she was visiting in Atlanta at the home of her sister, Mrs. M. F. Woodson, the mother of the propounder, where she had been, with the exception of about two weeks, for a little more than three months.   She was in feeble health, but was able to walk up and down stairs to her meals, and was perfectly clear in her mind.     She had recently made a trip of two weeks' duration, unaccompanied, from Atlanta to Madison and return, on a visit to another sister.     She was not confined to her room on account of her health until about ten days after the execution of the will offered for probate.     She had previously pre-

pared, in her own handwriting, a paper which she intended as a testamentary disposition of her property. Aside from unimportant changes in phraseology, this instrument was practically identical with the one offered for probate, with the following exceptions: The document written by Mrs. Holmes contained the following provision: "Having neglected to mention one item of indebtedness that both I and my husband are due the estate of my nephew, C. D. Woodson, deceased [the brother of the propounder]; his brothers hold the papers of my husband for the same; and I having borrowed the money myself for the benefit of my husband, at my death I desire this to be paid back out of my estate before division." The corresponding provision in the will offered for probate was as follows: "I having borrowed from my nephew, C. D. Woodson, about the sum of two hundred dollars, which was used for the benefit of my husband; and my nephews, W. D. Woodson and Stewart Woodson, holding the evidence of debt, I desire that this debt be paid next." The will prepared by Mrs. Holmes stated merely; "I hereby appoint my nephew, Mr. W. D. Woodson, my executor." The will offered for probate also appointed Woodson executor, but further provided: "He shall not be required to give any bond or make any returns to any person or court whatever, and this will further empowers him to sell or dispose of any and all of the property that I may own, or that may hereafter come into my possession, as he may deem it for the best interest of the estate, without any order of court, or any further authority than this will from anybody." Mrs. Holmes gave this holograph instrument to Woodson and asked him "if it was drawn up in proper shape." Woodson turned to the signature, "saw it was not properly executed, and told her so." She then requested him to take it to his (Woodson's) lawyer, "have it put in proper legal form, and return it to her." Woodson took the paper to Golightly, an attorney, who drew up the will subsequently offered for probate, and turned over the paper in this form to Mrs. Holmes. Woodson speaks of Golightly as "our attorney," and from other evidence introduced on the trial it is inferable that he meant that he was the attorney for Langston & Woodson, for which firm W. D. Woodson was bookkeeper. On several occasions after the will drawn by Golightly was handed to her, Mrs. Holmes requested Woodson to bring witnesses to the house, so that she could execute

her will, but he omitted to do this until the occasion on which the paper was signed.  Woodson swears, as to this : " She said she wanted to execute it, and made that request two or three times before I complied with it.  I had not read the will and did not know the details of it.  She suggested my brother Stewart as executor. He declined, saying he did not have time to look after it.  He told her I would serve."  When the witnesses came, Mrs. Holmes walked unsupported from her room into the hall, where the witnesses were, and signed the paper in their presence.  At that time her mind was entirely clear.  About a month later she returned to her home in Pike county in a dying condition, and expired a few days after her arrival at her home.  From the time the instrument in dispute was drawn up by the attorney to the time it was executed by Mrs. Holmes was two weeks, and during all of that time the paper was in Mrs. Holmes' possession.  The will offered for probate, in addition to the provisions heretofore mentioned, provided for the payment of the funeral expenses of the testatrix, devised her real estate in the city of Barnesville jointly to her husband and her two sisters, Mrs. Martha F. Woodson and Mrs. Julia F. Foster, gave certain minor legacies of furniture, bedding, china, and silverware to members of her own and her husband's families, provided for the disposition of the shares left to her two sisters in the event of their death during the lifetime of the testatrix, and also contained the following item : " In consideration of my nephew, William D. Woodson, of Atlanta, Georgia, [the executor and propounder of the will], having paid the taxes and insurance on [the real estate in Barnesville, before mentioned]; I desire that he be refunded the amount for which he holds vouchers, and that this claim have priority over all other claims against my estate, except funeral expenses and expenses of my last illness."  The jury found against the will.  The propounder made a motion for a new trial, which was overruled, and he excepted.

1. One ground of the motion for a new trial complains that the court erred in refusing to direct a verdict for the propounder. While, in our opinion, as will be hereafter shown, the court might with propriety have directed a verdict in the propounder's favor, it is well settled that under no circumstances, will this court reverse a judgment of the court below on account of the refusal to direct a verdict in favor of either party to a cause.  *Kelly* v. *Strouse,* 116 *Ga.* 873.

2, 3. The motion for a new trial also complains that the court erred in refusing, on motion of counsel for the propounder, at the conclusion of the evidence for the caveator, to strike all the grounds of the caveat except the one alleging that Mrs. Holmes did not sign the will, the ground of the motion to strike being that no evidence had been offered to sustain any of these grounds of the caveat. Error is also assigned, in other grounds of the motion, upon a portion of the charge of the court below, in which he summed up, as the contentions of the parties, all of the grounds of the caveat, those which had been supported by evidence as well as those which had not, informing the jury that they were merely the contentions of the parties, "which form the issues you are to try." Taken each for itself, these grounds of the motion would hardly authorize this court to reverse the judgment refusing to grant a new trial; but when considered all together in the light of the evidence, it becomes apparent that the ruling and the charges complained of must have been prejudicial to the propounder, in that they had a tendency to create upon the minds of the jury an erroneous impression as to what it was really incumbent upon them to decide. The motion of the propounder to strike a portion of the caveat was, if the expression be permissible, in the nature of a motion to partially nonsuit the caveator. In support of those grounds which it was moved to strike, there was practically no evidence. We are not prepared, however, to say that the refusal to strike these grounds was of itself error, but it was at least incumbent upon the court to give to the jury appropriate instructions which would enable them to clearly determine what facts were in issue before them. Instead of doing this, the judge read to the jury all of these unsupported averments of the caveat, cautioning them, it is true, that they were merely the contentions of the parties and were not to be regarded as evidence, but distinctly informing them that these contentions formed the issues which they were to try. Taken all together, as before stated, and in the light of the entire record, we are satisfied that this was ground for a new trial.

4. The motion for a new trial also complains of the action of the court, referred to in the statement of facts in the outset of this opinion, in suggesting ex mero motu, after the conclusion of the evidence and while counsel was making his argument to the jury,

that the caveat be so amended as to allege that Mrs. Holmes did not, at the time she signed the will offered for probate, know its contents.    The grounds of complaint set out in the motion are as follows: " (a) Because the statement of the court that there was no such ground of caveat, and the court's voluntary offer to allow such amendment, lent undue weight to the argument of caveator's counsel to the jury on this question, and was calculated to induce the jury to believe that the court thought there was something beneficial to caveator and detrimental to propounder in the position and argument of counsel, and said action by the court was calculated to create on the mind of the jury [the impression] that the court had the opinion that the caveat was good and should be sustained on said ground ; (b) because there was not a particle of evidence to sustain it [the amendment], and the court's allowing it and permitting counsel to argue it to the jury had a tendency to create in their minds the belief that the court was of opinion that there was some evidence to sustain it; (c) allowing said amendment so late in the trial and under the circumstances under which it was allowed had a tendency to aid caveator's case and injure that of propounder.    Movant alleges that this action on the part of the court did control the verdict of the jury, because, after being out several hours considering said case, the jury returned into court and asked to be recharged on but one question, and that was the one embraced in the amended grounds of caveat, setting up that testatrix did not know the contents of the will when she signed it." It will be observed that, up to this stage of the trial, there was nothing upon which the jury could legally have found a verdict against the propounder.    Counsel for the caveator was arguing to the jury a point wholly outside the case and not contended for in the pleadings.    The action of the court in stopping this line of argument was entirely proper, but we do not think the same can be said of the further action in suggesting to counsel that he amend his pleadings so as to take in this unauthorized argument.    This suggestion, made as it was in the presence of the jury, was tantamount to saying to counsel: " You are making a good argument ; there is something in it, and if you will simply amend your pleadings so as to render it legal, the jury will be authorized to consider it." It amounted in a measure to an endorsement of the argument being made, and might easily have led

the jury to believe that the court was of the opinion that this objection to the propounding of the will was meritorious. That it did have considerable weight with them seems to be strongly indicated, as pointed out in the motion, by the fact that they asked to be recharged on this subject alone. Our law has been very liberal in regard to the allowance of amendments, but the line must be drawn when, as in the present case, the suggestion of an amendment by the court has a decided tendency to carry with it an inference that the court entertains an opinion as to the merits of the cause on trial. Any language or conduct on the part of the trial judge which tends to impress the jury with the idea that he believes that the truth of any issue involved in the trial of the case is with one side or the other is cause for a new trial.

5. So far as concerns the contentions of the caveator that the decedent did not sign the instrument offered for probate as her will, that she was unduly influenced to execute it by any beneficiary thereunder, that she was led to sign the paper by reason of false and fraudulent representations to her, that she lacked mental capacity to make a will, or that the paper was fraudulently altered by Woodson, the finding of the jury is in the teeth of the uncontradicted evidence. Only upon one of these contentions was any evidence introduced. With reference to the signature to the will offered for probate, the caveator, who was the husband of the decedent, testified: " To the best of my knowledge and belief, I do not believe that is her signature; " but, upon cross-examination, he said: ." I will not say either way, whether or not it is her signature. To the best of my knowledge and belief, I do not believe it is her signature. I qualify my remark that way; nobody could say positively that it is not her signature and tell the truth." Opposed to this, the subscribing witnesses all swore that they saw Mrs. Holmes sign the will; so that as to this point it may be very properly said that the evidence is not in any manner conflicting. Only upon one theory can the verdict stand, viz., that the evidence showed that Woodson procured the execution of the will, that he was a beneficiary thereunder, and it was therefore incumbent upon him to show by more direct and positive testimony than would ordinarily be requisite that Mrs. Holmes knew its contents, that he failed to do this, and that the jury were authorized to find against the will on the ground that the testatrix did not know its

contents. That Mrs. Holmes had possession of the will for two weeks prior to its execution, that she was in full possession of her mental faculties during all of that time, and that she signed it in the presence of the attesting witnesses (all of which was clearly proved in this case), would ordinarily give rise to the presumption that she knew its contents To overcome that presumption and place upon the propounder the burden of affirmatively showing that she was aware of its contents, it must appear that some person claiming a considerable beneficial interest under the will either wrote the instrument or procured its writing and execution. There was no contention that any one other than Woodson, the executor and propounder, had anything to do with bringing about the execution of the will now under consideration, and no evidence to support such a contention had it been made; so the entire case hinges on whether Woodson's conduct, as disclosed by the evidence, coupled with the interest that he took under the will, was such as to bring the case within the rule invoked by the caveator. In our opinion it was not. In the first place, it can not be said that Woodson, properly speaking, took any " considerable " beneficial interest under the will, if indeed, he can be said to have taken any interest at all. The only item of the will which even professes to regard him in the light of a legatee is the one already quoted, which recognizes and provides for the payment of a debt, the exact amount of which seems to have not been known by the testatrix, but which was to be limited by the amount for which he held vouchers. It is self-evident that Woodson did not need a testamentary provision to establish his right to recover this debt against the estate, and, so far as making him a beneficiary of the will is concerned, this provision was no more effective than would have been one which professed to give him a house and lot which she rented from him and to which he already had title in fee simple. Nor can it be said that under this item he obtained even the shadowy benefit of having a debt recognized and established, for the will only provided for the payment of a debt for which the creditor held vouchers; or, in other words, it only recognized a debt which had already been recognized. The only other mention of Woodson in the will (except incidentally) was in his appointment as executor and as trustee to hold certain contingent legacies which never ripened in the legatees. Far from giving a beneficial interest, these appoint-

ments imposed burdens of weight and responsibility. It is true that the executor is relieved from the necessity of making returns to any court and is empowered to dispose of certain property at private sale; but, in order to hold that this gave a beneficial interest to Woodson, it is necessary to assume that he was dishonest and intended to squander the estate, a presumption raised neither by the law of Georgia nor the facts of this case.

Furthermore, the evidence, in our opinion, fails to show that Woodson, in any proper sense, "procured" the making of this will. There is not a syllable in the record to indicate that he made any suggestion to the testatrix as to how she should dispose of her property, or that he expressed or entertained the slightest desire that she should make a will at all. On the contrary, she seems to have taken the initiative in every move that was made towards the preparation of a will, while everything that he did was done as a matter of accommodation to her and in furtherance of her expressed wishes. We do not lose sight of the fact that, at the request of Mrs. Holmes, Woodson had "our attorney" to draw the will. For aught that appears from the record, however, the draughtsman was as much the attorney of Mrs. Holmes as of Woodson; in fact, we incline to the opinion that it is fairly inferable from the evidence that for the purposes of this will he was solely the attorney of Mrs. Holmes, and that Woodson was merely the go-between and mouthpiece of Mrs. Holmes in having the will drawn in accordance with her wishes. The record is silent as to who paid the attorney for his services; but there is certainly nothing to indicate that he was acting in the capacity of attorney for Woodson in drawing Mrs. Holmes' will. It seems to have been only after a considerable effort and some importunities on the part of Mrs. Holmes that Woodson was induced to ask witnesses to come to the house to attest the execution of the instrument, and there is absolutely nothing in the record to show any eagerness or anxiety on his part that the will should be executed.

We have gone very carefully into the cases cited in the brief of counsel for the defendant in error, as well as many others bearing upon this subject, and we find that those relied upon by counsel are very different as to their facts from the case now under consideration. In *Beall* v. *Mann*, 5 *Ga.* 456, the rule is laid down

that "the presumption is strong against a party preparing a will, who takes a benefit under it." In *Hughes* v. *Meredith*, 24 *Ga.* 325, which is perhaps the leading case in Georgia on this subject, the *scrivener* who *wrote* the will took a *large* beneficial interest under it. In *Carrie* v. *Cumming*, 26 *Ga.* 690, the executor who wrote the will was made both the executor and the principal legatee. In *Adair* v. *Adair*, 30 *Ga.* 102, the will was *prepared* by one who took a large beneficial interest under it. All these decisions pronounce sound and well-recognized principles of law, but, as must appear from the statement of facts which we have already presented, they are in no sense applicable to the present case. On the other hand, the case of *Carter* v. *Dixon*, 69 *Ga.* 82, holds squarely: "That the draughtsman of a will was made the executor, and his relations received a considerable portion of the estate devised, does not raise any presumption of undue influence over the testator, which must be rebutted by proof." That case is certainly a stronger one for the caveator upon its facts than the one we are now considering, and the language quoted would seem to settle, adversely to the contention of the defendant in error, the question of the burden which, under the law, Woodson was required to sustain in the court below.

In Schouler on Wills, § 245, we find the following: " It is well settled that any will, *prepared or procured* by one . . . interested in its provisions, imposes an additional burden, if assailed, upon those who seek to establish it; for the court, or the trier of the case, regards that circumstance with suspicion and jealousy, and desires to be satisfied that the paper which is propounded expresses the true will of the deceased, and not that of the interested party." (Italics ours.) In section 247 it is stated, that " Where error, fraud, or undue influence is charged, stricter proof than usual may be needful to show not only capacity, but that the testator knew the contents of the instrument he executed. In ordinary cases, to be sure, the formal execution of the will by a person who can read and write imports knowledge of its contents. But where it is shown that the testator, being blind, illiterate, or very feeble, could not have gained this knowledge unaided, more positive proof that he actually knew and assented is required to repel any suspicion which circumstances may have cast upon the good faith of the transaction ; as, for instance, where the draftsman or party man-

aging the execution of the will takes a disproportionate interest under it. It is not necessary to prove in such cases that the will was read over to the testator, nor to show written instructions from him, but it should appear that in some way its contents were correctly imparted to him and correspond with his wishes." Again, in section 245, it is said: " The mere presence of a beneficiary under a will at its execution is not improper, suspicious, or objectionable, where no proof appears that he *actively instigated* the business." (Italics ours.) "A suspicion is justly entertained of a will conferring large benefits on the person by whom or by whose agent it was prepared . . . ; but it has been said that this suspicion goes no further than to necessitate somewhat stricter proof as to the testator's capacity, though not as to his knowledge of the contents of the will. Such knowledge is of course requisite ; but it will be presumed if there is no evidence to the contrary, and if capacity is duly proved." 1 Jar. Wills (6th ed.), top p. 49.

After a very thorough review of this case we are constrained to hold that there was an entire lack of evidence to support a finding that the testatrix did not know the contents of the will offered for probate, or an instruction to the effect that it was necessary for the propounder to show by stronger than the ordinary proof that she did have such knowledge. As before stated, the other grounds of the caveat were wholly unsupported by evidence and were practically abandoned by counsel in this court. In view of what has here been held, it follows that the judgment of the court below overruling the motion for a new trial must be reversed. The foregoing disposes of every point made by the motion for a new trial which we deem it necessary to here discuss; for, upon the second trial of this case in the light of the principles here announced, none of the points not specifically dealt with are at all likely to arise. We have reached the conclusion, after mature deliberation, that a new trial should be granted to the propounder, and accordingly send the case back for another hearing.

*Judgment reversed. By five Justices.*