## UNDERWOOD *et al. v.* THURMAN.

1. Grounds of objection to the probate of a paper propounded as a will are not, though separately set forth in the caveat, "pleas" in the sense in which this word is used in section 5330 of the Civil Code; and consequently, it is not the right of the propounder to demand that if the verdict be one denying probate, it shall show upon which one or more of such grounds it is based.

2. That the execution of an instrument purporting to be a will was procured by the exercise of undue influence upon the alleged testator can not be proved by his declarations made after he signed the paper.

3. When the attestation clause to such an instrument recites all the facts essential to its due execution as a will, and it is shown that the alleged testator and those whose names appear thereon as witnesses actually affixed their signatures to the paper, a presumption arises that it was executed in the manner prescribed by law for the execution of wills, and this is so though there may be on the part of one or more of the witnesses a total failure of memory as to some or all of the circumstances attending the execution.

Argued June 16,—Decided July 12, 1900.

Probate of will—appeal. Before Judge Lumpkin. Fulton superior court. August 9, 1899.

*Smith, Hammond & Smith, J. T. Pendleton*, and *King & Spalding*, for plaintiffs.

*King & Anderson* and *Lewis W. Thomas*, contra.

LUMPKIN, P. J.   A paper purporting to be the will of F. D. Thurman, in which no one was named as executor, was by Mrs. Florence A. Underwood, a "person interested," offered for probate in solemn form in the court of ordinary of Fulton county. Other persons interested were afterwards made parties, and joined in the prayer for probate.   Mrs. Mary G. Thurman, the widow and sole heir of the alleged testator, filed a caveat based on three grounds, viz.: (1) that the paper was not executed in the manner prescribed by law; (2) that F. D. Thurman was not, at the time of its execution, of sound and disposing mind and memory, and (3) that he was induced to sign it because of undue influence on the part of Mrs. Underwood.   The ordinary adjudged that the paper was entitled to probate, and Mrs. Thurman entered an appeal to the superior court.   On the trial therein a verdict was returned in her favor, and the propounders moved for a new trial.   Their motion contained four general and thirty-six special grounds.   As the case is to be tried again, we shall say nothing concerning its merits.   This, for the time being, disposes of the four general grounds.   The three dozen of special ones present but three units of questions with which we consider it necessary to deal specifically.   In the remaining three and thirty, various points are made upon rulings, charges, and refusals to charge.   We do not undertake to say that as to all of the matters thus complained of the trial judge was entirely free from error; but conceding that some of the grounds to which we are now referring do show that he made some mistakes, we are quite sure that none of them were sufficiently serious to require the granting of a new trial.   We agree with him that, in a case like this, it would be strange indeed "if astute lawyers, after a microscopic examination and diligent preparation, extending through about eight months since the trial and apparently reviewing every sentence, every phrase, even every word of the judge, could not discover something which seemed to them a flaw or error of more or less magnitude"; and we think it would be something wonderful if any judge, even one so able and painstaking as he, could

try a case involving so many questions without falling into some slight errors, either of omission or commission. Our brother below, while frankly conceding that he may have done so, did not think there was any error on his part which demanded a judgment setting the verdict aside. Being unable to agree with him to this extent, we feel constrained to order a new trial.

1. Several grounds of the motion distinctly present the question whether or not it was the right of the propounders to have the jury, in case they found the paper was not the will of F. D. Thurman, specify in their verdict upon which ground or grounds of the caveat their finding was based. The judge held that the propounders had no such right, and as to this matter our judgment coincides with his.

We do not think, as was contended, that the question should be resolved against the propounders merely because the ultimate issue in the case was simply devisavit vel non, will or no will. It frequently happens that in the trial of ordinary actions there is a main and controlling issue, viz.: "Shall the plaintiff recover or shall he not?" and yet, in deciding this issue, it may become necessary for the jury to determine a number of other issues presented by different pleas, each setting up a distinct ground of defense, a finding on any one of which favorably to the defendant would defeat the plaintiff's action. So here, a finding in favor of any one of the grounds of caveat would be fatal to the case of the propounders. If, then, the plaintiff in the ordinary action is, on principle, entitled to be informed by the verdict itself, when adverse to him, on what plea or pleas it is based, we see no reason why, on principle, the propounders of a testamentary paper met with a caveat containing separate and distinct grounds should not have a similar right. But the question is not one to be decided by inquiring what the law ought to be, but what it is. It turns at last upon the construction to be given to section 5330 of the Civil Code, which provides: "If there are several pleas filed by the defendant, a verdict for the defendant must show upon which of the pleas the verdict is rendered. The jury may render such verdict upon all the pleas, if they see proper so to do. And the judges of the superior courts of this State, upon request of the jury, in

the trial of all civil cases, shall furnish said jury with written instructions as to the form of their verdict." If this section did not form a part of our statute law, it would not, we are sure, be seriously contended that the propounders had the right upon which they insisted. So the real question is: does this section apply to will cases? We do not think so. The word "pleas" is not, in its usual and ordinary signification, applicable to the grounds of a caveat to the probate of a paper propounded as a will, and there is nothing in the section which remotely suggests that this pregnant word should be understood in any other sense than that generally ascribed to it. This being so, the courts should treat this word, as used in this section, as meaning pleas proper. A plea is "a formal answer made by a defendant to a demand or charge." Anderson's Law Dict. Obviously, this definition would not apply to a caveat filed in probate proceedings. Much was said in the arguments of counsel and in their briefs in support of the contentions that the propounders were "plaintiffs," that the caveatrix was a "defendant," and that the several grounds of her caveat were "pleas"; but we think all these contentions are answered in what has been said above. Doubtless the three terms just quoted have sometimes been loosely used in dealing with will cases, but this affords no aid in arriving at the true meaning of the code section under consideration. The first two sentences of this section, which are the only portions thereof with the construction of which we are now concerned, became a part of our written law long prior to the uniform procedure act of 1887, which abolished all technical forms of pleading — that is to say, at a time when papers filed in the course of legal procedure were called by their right names, and nothing which was not in point of fact a "plea" was recognized as such. See Code of 1863, § 3480. Accordingly, the term "pleas" is to be regarded as having been used advisedly and deliberately in the precise sense in which it was then understood.

It was argued that, in the absence of a requirement to frame the verdict as the propounders insisted it should be framed if against them, it was possible that the verdict denying probate might have been rendered without the assent of all of the jurors to the truth of any one ground of the caveat. For instance, it

was urged that four only of them might have believed the paper was not duly executed; that another four, and they only, might have believed the alleged testator was of unsound mind; and that the remaining four, and they only, might have believed the execution of the paper was procured by undue influence. Conceding to this argument all the force it deserves, we have only to say that if the law as it stands affords no adequate remedy for an evil of this kind, the power to correct it lies in the legislature and not in the courts.

A verdict in the form demanded by the propounders in case the caveat should be sustained is analogous to "a special verdict of the facts only," as provided for in section 4849 of the Civil Code; but the propounders can derive no aid from that section, because it is expressly limited in its application to trials of "proceedings for equitable relief."

The cases of Browne v. Browne, 22 Md. 103, and Withee v. Rowe, 45 Me. 571, relied on by counsel for plaintiffs in error, are not in point; for it seems that both of them were tried in pursuance of a practice derived from statutes authorizing or requiring the submission of special issues to the jury. We have, in cases like the present, no such practice nor any statute which would authorize it.

2. One ground of the motion for a new trial alleges error in refusing to give in charge a written request to the effect that "undue influence" could not be proved by evidence of declarations made by the alleged testator after the execution of the paper propounded as his will. This request was not covered by any instruction contained in the general charge. We think it should have been given. Such declarations are not competent evidence to show that the statements of fact therein embraced are true, and can not be regarded as furnishing even the slightest proof that there was any undue influence. As to that matter, they should be treated as nothing but mere hearsay, for certainly it would never do to allow a will to be in this manner set at naught. See *Mallery* v. *Young*, 94 *Ga.* 804; *Jones* v. *Grogan*, 98 *Ga.* 552, and authorities cited in each.

3. The attestation clause of the alleged will and the signatures thereon are as follows:

"Signed sealed published and declared
in our presence, by F. D. Thurman
as his last Will and Testament,
and in his presence and in the
presence of each of us we sub-
scribe the same as witnesses.

"F. D. Thurman (L. S.)

"Witness
"P. L. Mynatt
"B. F. Abbott Jr.
"J. W. Bridges."

At the trial P. L. Mynatt testified that he recognized his sig-
nature upon the paper, that, in his opinion, the word "Wit-
ness," appearing above the names of the witnesses, was in his
handwriting, and that he remembered nothing whatever as to
the execution of the instrument.   B. F. Abbott Jr. testified
that at the request of Mynatt he signed the paper as a witness,
but did not know its character, and was unable to state whether
at the time he so signed F. D. Thurman was present or not.
There was evidence showing that, prior to the trial, this witness
had, in a letter written by himself, positively stated that when
he signed the paper Thurman was not present.   The testimony
of J. W. Bridges, taken by interrogatories, was sufficient to prove
that the paper was duly executed as a will, but an effort was
made to impeach him by showing that in answer to a previous set
of interrogatories he had sworn that the paper was typewritten —
the fact being that it was in the handwriting of Thurman.

Error is assigned upon the court's refusal to give in charge
to the jury a written request to the effect that, inasmuch as the
attestation clause to the paper propounded  was in due form,
a presumption that it was duly executed as a will arose.   In
determining whether or not this request should have been
given, it is of the utmost importance to keep clearly in mind
the fact that there was no dispute at all that the signatures upon
the document were the genuine signatures of Thurman and
the three witnesses.   Therefore, under the circumstances, the
request could not, as was insisted, fairly be said to invoke an in-
struction that the bare fact that the attestation clause was in due
form raised a presumption of due execution, but its real mean-

ing was that, in view of the fact that Thurman and the wit-
nesses undoubtedly affixed their signatures to the paper, and of
the further fact that the attestation clause recited all the essen-
tials of due execution, such a presumption did arise. Treating
the request as having this meaning—and, in the light of what
is stated above, it could not be fairly said to have had any other,—
we think it was pertinent and appropriate to the case as it
stood at the close of the testimony; and, accordingly, that the
refusal to give it in charge was erroneous.

An attestation clause, appearing upon a testamentary paper
and containing a recital of all the facts essential to its due ex-
ecution as a will, as was the case here, raises a presumption
that such paper was executed with all the requisite legal for-
malities pertaining to wills, if it be shown, as was done in the
present instance, that the alleged testator and the witnesses ac-
tually affixed their signatures to the instrument; nor does it mat-
ter that as to two of the witnesses there was such a failure of
memory as that above indicated. "If a *will purports to have
been duly signed, attested and witnessed*, on proof of execution the
court will presume, in the case of the death of the witnesses or
in case they do not remember the facts connected with its exe-
cution, that the law was complied with." 1 Jones, Ev. § 44,
p. 89. On this subject Greenleaf says: "If the subscribing
witnesses to a will are dead, or if, being present, they are for-
getful of all the facts, or of any material fact to its due execu-
tion, the law will in such cases supply the defect of proof by
presuming that the requisites of the statute were duly observed."
1 Gr. Ev. (16th ed.) § 38a. From 1 Redfield on the Law of
Wills (4th ed. *238) we extract the following: "It seems to
be well settled that, in the absence of all proof, the witnesses
being deceased or not in a condition to give testimony, the pre-
sumption omnia rite acta will arise, as in ordinary cases. So,
also, where the attestation is general, not enumerating the par-
ticulars, it will be presumed the will was duly executed, unless
the contrary appear. And where the attestation clause con-
tains all the particulars of a good execution, it will always be
prima facie evidence of due execution, and will often prevail
over the testimony of the witnesses, who give evidence tending
to show that some of the requisites were omitted." The dis-

tinguished author also says that "the mere forgetfulness of the witnesses of the facts certified in the attestation clause is not regarded as an obstruction to granting probate of the will;" and, after referring to a case where probate was allowed even where the witnesses deposed that the legal requirements were not complied with, adds that it has been held, the presumption of due execution "will only be made where the will, upon its face, appears to have been duly executed, or, being lost, proper evidence is adduced of such having been the fact." Ibid. *239. To the same effect, see 1 Jarman, Wills (5th Am. ed.), 219, 220. With reference to the utility and probative force of attestation clauses, Schouler says: "The advantage of an attestation clause with suitable recitals is shown in many of our decisions relating to the proof of wills. Where, indeed, there is nothing but a formal attestation clause on one side, and the testimony decidedly adverse of both subscribing witnesses on the other, probate of a will has been refused. But, with the aid of a proper attestation clause to contradict such persons, or possibly without it, wills have been .established in proof, against the concurring statements of both subscribing witnesses or the statement of either that the legal requirements of execution were not fully complied with. And whenever these witnesses fail to recollect and give no positive testimony, or can not, both or all, be produced in court, the clearer the recitals of an attestation clause, the stronger becomes the presumption that the will was executed in all details as the law requires. It matters little, under such circumstances, that subscribing witnesses can not testify affirmatively to the facts thus recited; that the memory fails; that details are not orally shown with clearness. And though the attesting witnesses were all dead or beyond the reach of process, proof of their handwriting would in general make out a prima facie case of due execution, which, if aided by the recitals of a full attestation clause, would afford a very strong presumption, unless the contrary appeared on the face of the will. But in no case will the presumption of compliance with all statutory formalities arise unless the will appears on its face to have been duly executed. And any such presumption is rebutted by clear proof to the contrary." Schouler on Wills, § 347. See, also, 29 Am. & Eng. Enc. L. 199–202; Chaplin on Wills, 281 et seq.

All of these text-books support the doctrine announced by reference to numerous authorities, an examination of which can not fail to remove all doubt of its correctness. Indeed, it is no longer open to serious question. Certainly this is so in this State, for in *Deupree* v. *Deupree*, 45 *Ga.* 415, a majority of the court, at the January term, 1872, held that under the circumstances of that case a presumption of the due execution of a paper, testamentary in character and shown to have been signed by the alleged testator, arose from an attestation clause which did not recite that the witnesses signed in the presence of the testator; and all the members of the court agreed that if the attestation clause had so recited, it would, when the signatures of the testator and the witnesses were proved, have raised a presumption of law that the paper was duly attested as a will. Nothing to the contrary was laid down in this case when it was again here at the July term, 1873 (49 *Ga.* 325); nor has this court, so far as we have been able to ascertain, ever held that a presumption of due execution did not arise in such a case as the one now before it.

It was further insisted that "the presumption stated in the request would not arise if the attesting witnesses gave affirmative evidence of the want of due execution," and "would only arise if they failed to remember or were dead." In this connection it was argued that the testimony of the subscribing witnesses in effect negatived due execution. The brief summary of this testimony appearing above will show that this last position is untenable. As to two of the witnesses, there was certainly lack or failure of memory, and the testimony of the other afforded positive proof of due execution. Even if Abbott and Bridges were so impeached as to break down their credibility, nothing more could result than the elimination of their testimony from the case. It is palpably true that their impeachment would not furnish proof that the paper was not duly executed as a will. We can not, therefore, agree with counsel for the defendant in error that there was on the part of any of the attesting witnesses affirmative evidence that there was a want of proper execution; and, accordingly, we could, for the purposes of this case, fully concede the correctness of their assertion that the presumption of due execution arises only where

the witnesses fail to remember or die.    We are, however, by no means prepared to admit that the rule should be thus restricted.    See, in addition to the authorities above given, those cited in *Gillis* v. *Gillis*, 96 *Ga.* 15 – 17.

The point was also made that no presumption of due execution could arise in this case, because the attestation clause was not itself in due form, for the reason that the appearance of the word "Witness" under that clause and above the names of the witnesses showed that at least one of them did not know the contents of the attestation clause but merely supposed he was attesting some ordinary instrument such as a contract.    The fact that this word was written on the paper might be accounted for in many conjectural ways.    We do not care to go into them. That it was so written is a circumstance altogether too trivial to affect the real merits of the question in hand.

Another attack on the attestation clause was based on the fact that the signature of the alleged testator was below, and not above, this clause.    So far as we can gather from the copy in the record, Thurman, in selecting the place for his signature, did not depart to any great extent from what is customary in such cases.    See what Lord Campbell said about such matters in Roberts *v.* Phillips, 4 Ellis & Bl. 450; s. c. 30 Eng. Law & Eq. 147.

In view of the two errors discussed above, and more especially of the latter, the seriousness of which in its bearing upon the case as it stood will have been perceived, we think there should be another trial.

*Judgment reversed.    All the Justices concurring.*