## SHEWMAKE v. SHEWMAKE et al.

1. The court did not err in charging the jury as follows: "If you be- lieve from the evidence that at the time Hal P. Shewmake, the testator, called upon the subscribing witnesses to attest their names, to sign the instrument as witnesses, that his name was at that time signed to the instrument as testator, then you would have to go further and deter- mine whether or not the testator, Hal P. Shewmake, told the wit- nesses in effect, or, in other words, in effect acknowledged his signature to the instruments. If you believe that he did not, notwithstanding you may believe from the evidence that his name appeared at the time to the instruments; if you don't believe that he acknowledged his signature in the presence of these witnesses, you would be authorized under the law to find against the will." This was in substance a cor- rect proposition of law. And in view of the evidence quoted in the opinion and the authorities cited, it will be seen that the exception to the charge last quoted, that it was not authorized by the evidence, is not well taken.

2. There was no error, on the ground that it was not authorized by the evidence, in charging the jury as follows: "If you believe that the tes- tator's name was signed to the instruments at the time he procured the witnesses to sign as witnesses, and you believe further that the testator, Hal P. Shewmake, told the witnesses, or that he acknowledged his signature in their presence, why then you would be authorized to find in favor of the will."

3. The court did not err in giving a charge to the jury which in substance instructed them that it is not necessary for the testator actually to sign the instrument in the presence of the witnesses, and that any ac- knowledgment before them of his signature to the instrument is suffi- cient, and that a due acknowledgment need not be embodied in any par- ticular verbal formula, but may be inferred from conduct which amounts to an acknowledgment of the signature, although the witnesses did not see the signature.

4. Upon the issue as to whether a will offered for probate was properly executed or not, and there being a full and complete attestation clause properly signed, the jury was properly instructed that "A full and complete attestation clause properly signed is prima facie evidence of the due execution of the will, and has the effect of shifting the burden of proof to those who deny the proper execution of the instrument or the will."

5. The court did not err in admitting in evidence copies of the papers offered as the will, over the objection that the execution of the will had not been proved. Under the facts of the case the court properly admitted evidence tending to show the genuineness of the testator's signature to the will.

JANUARY 18, 1916.   REHEARING DENIED MARCH 2, 1916.

Appeal.   Before Judge Hawkins—motion for new trial before Judge Larsen.   Laurens superior court.   September 15, 1914.

Claude Shewmake, W. W. Robinson, and S. T. Hall propounded for probate in solemn form two documents as constituting the last will and testament of Hal P. Shewmake, who died on November 25, 1913. A caveat was interposed by Dora Bell Shewmake, the widow and sole heir at law of Hal P. Shewmake, upon the grounds, that neither of the two papers offered for probate was a last will or testament of Hal P. Shewmake; that he died intestate; that neither of the papers so offered was ever executed by him as his last will and testament; that neither of them was signed by him in the presence of the attesting witnesses who subscribed their names as such, nor was his signature to either of the papers ever acknowledged by him as his signature in the presence of the persons signing as attesting witnesses, or either of them; and that at the time the instruments were attested and subscribed by the witnesses whose names appear thereon as subscribing witnesses, Hal P. Shewmake had not signed said wills and did not sign them at the time; and that at the time the same were subscribed in his presence by the subscribing witnesses whose names are attached thereto as such, neither of the said wills had been executed by having his signature attached thereto. Upon the hearing in the court of ordinary the papers were admitted to probate and record as the last will of the testator; and the caveatrix appealed. On the trial in the superior court the jury found "in favor of the will." A motion by the caveatrix for a new trial was overruled, and she excepted. (For the grounds of this motion see the opinion of the court, infra.)

Each of the documents in question is headed, "State of Georgia, Lawrence [Laurens] county. In the name of God amen." The first contains the following:

"I, Hal P. Shewmake, of the County and State above written, being of sound and disposing mind and memory as well as in good health, and knowing that in the course of human events I must some day pass away, by virtue of authority given me in a deed of trust made to me as trustee by M. A. Shewmake, do publish and declare this my last will and testament, disposing of said trust estate and all increased item.

"1. [Provides for burial.]

"2. I desire and direct that the trust estate be continued as long as my beloved wife, Dora Webb Shewmake, shall remain single

and bear my name, and until all my just debts shall have been paid.

"3. [Provides for payment of debts.]

"4. I desire and direct that my executors shall pay to my beloved wife, Dora Webb Shewmake, the sum of $960.00 a year, so long as she remains single and bears my name; this sum to be paid to her in monthly installments of $80.00 per month. Should it be necessary, and in order to provide for these monthly installments, I desire and direct my executors to make a loan, using any part of the trust estate as security for the same.

"5. Should my beloved wife, Dora Bell Webb Shewmake, marry again, then I desire and direct that the amount provided for in Item 4 shall cease, and I authorize and I direct my executors to pay over to her in lieu the sum of $500.00, which amount shall be in full of all claims against said trust estate.

"6. I desire and direct that after paying my beloved wife, Dora Bell Webb Shewmake, the amount mentioned in item 5, that the balance of the income from said trust estate be used in paying my just debts, if any, at the time of my death; and continued in this manner until paid in full.

"7. I hereby appoint and nominate Claude Shewmake, W. W. Robinson, and S. T. Hall as my executors of this my last will and testament, disposing of said trust estate; and they are relieved of giving bond or making returns to any court; but should it be necessary for any reason to appoint other executors than these mentioned, then I desire and direct that they be required to give bond, and make regular returns to the court as required by law.

"8. Should my executors, at any time, deem it wise and to the best interest of the trust estate to sell any part, or all of the same, and invest in other securities, I hereby authorize them to do so, without an order from any court. I make this provision so that in case my brothers want to sell any part or all of their interest in which the trust estate might be interested, they can do so, without being hampered by the trust estate.

"9. I desire and direct that after all of the several items mentioned above shall have been satisfied in the manner named, should there still be a surplus from the income of the trust estate, that this surplus or balance be held in trust with the balance of the trust estate, and disposed of as mentioned in item 10.

"10. I desire and direct, that immmediately after the marriage again of my beloved wife, Dora Bell Webb Shewmake, and all of my just debts shall have been paid in full, that the trust estate shall cease, and the remainder of said trust estate and all increase shall be divided as follows:  I give to each of my two sisters, Annie V. Whitehead and Lena S. Johnston, $50.00 each, the balance of said trust estate to be divided equally between my three brothers, Claude Shewmake, Wm. J. Shewmake, and Marshall A. Shewmake. Should any or all of my brothers be dead, the share of such deceased brother or brothers shall go to and be the property of the child or children of such deceased brother or brothers, as the case may be.

"Signed and sealed by the testator, we in his presence and at his request and in the presence of each other have hereunto subscribed our names and attested the same as witnesses this 1st day of August, 1913.

    Chas. F. Ludwig

    A. H. Graham

    T. R. Ramsey."

[Signed] Hal P. Shewmake. Hal P. Shewmake under authority of trust deed from M. A. Shewmake. Hal P. Shewmake, trustee, dated Feb. 14th, 1911.

The other document contains the following:

"Having disposed of my trust estate by will and testament dated August 1st, 1913, I, Hal P. Shewmake of the State and County above written, being of sound and disposing mind and memory, as well as in good health, and knowing that some day I must pass away, do make, publish, and declare this my last will and testament, disposing of my personal estate only, which consists of two life-insurance policies in the North West Mutual Life Insurance Company of Milwaukee, Wis., 318371 and 666573 1/2.

"1. I desire and direct that as soon as this insurance money is collected that the sum of $300.00 out of this fund be paid over to my beloved wife, Dora Webb Shewmake, and the balance of this insurance money to become a part of my trust estate, and to be held in trust by the executors thereof, and to be used in paying the

several items mentioned in my last will and testament disposing of said trust estate, dated August 1st, 1913.

"2. I hereby nominate Claude Shewmake, W. W. Robinson, and S. T. Hall as executors of this my last will and testament disposing of my personal estate, under the same terms, conditions and authority as mentioned in my last will and testament dated August 1st, 1913, disposing of said trust estate.

"Signed and sealed by the testator, we in his presence and at his request and in the presence of each other have hereunto         Hal P. Shewmake. subscribed our names and attested the same as witnesses this 1st day of August, 1913.
Chas. F. Ludwig
A. H. Graham
T. R. Ramsey."

Chas. F. Ludwig testified as follows: I reside in Dublin. I knew the late Hal P. Shewmake. He is dead. I have examined the two papers shown to me. I have examined the signature, Charles F. Ludwig, A. H. Graham, and T. R. Ramsey, to both of these instruments. I signed them both. My signature is genuine. I saw the other two witnesses, A. H. Graham and T. R. Ramsey, sign as witnesses. We all three signed in the presence of Hal P. Shewmake. I saw all three of us sign these instruments. The way we came to sign these two instruments purporting to be the last will of H. P. Shewmake was that H. P. Shewmake came across the street. I saw him about thirty feet from me, before he said anything, with both of these two papers in his hand. He walked up to me and said he wanted me to sign these papers, and I asked him what it was, and he said his will. I asked him where his other witnesses were, and he said he did not know; and I happened to see Mr. Ramsey and Mr. Graham standing over about ten or fifteen feet, talking, and I called them, and we three went back to my place to my desk, and I signed first and in order named; and after we signed that, he said that there is another one under here. I already knew that the papers he claimed as his last wills, but I do not recall whether or not he told the other witnesses. I do not think he did, from the fact that Mr. Ramsey said, "I don't know

what this is I am signing; I hope it is not my death warrant," and Shewmake said "No, it is my will." He made that declaration in the presence of the three witnesses. I did not see Hal P. Shewmake sign these two documents. The only reason that I can assign was that he had a piece of paper covering all to just this part right here, to the attestation clause. Q. How much of the attestation clause was covered by that paper? A. I do not recall. I do not know whether part of it was or not. I remember there was a piece of paper covering it, but how far down it went I do not know. I did not see him sign his name to either of the papers. I do not mean to tell the jury that his signature to both the instruments was not there. The only reason I did not see the signature, I guess, was that he had them covered, both of them, with a piece of paper. I do not know whether the paper covered the space where the signature of Hal P. Shewmake now appears. I did not see the signature at that time. I do not know whether it was there or not. The attestation clauses were there to both documents when I signed them as a witness. I do not know whether the signature of Hal P. Shewmake to the will is a genuine signature. I do not know his signature when I see it. I have had several papers that he had his name on. I have seen him write; have seen his signature. I can't say whether it is his signature or not. I do not know enough about handwriting; anybody else could have, possibly, put the same thing there and it might not be his name. I do not know his signature from having seen him write. I never saw Mr. Hal P. Shewmake's signature that is on these papers until after his death. I did not see his signature to them until I saw the papers in the court of ordinary. On the will signed by Hal P. Shewmake and Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th, if the words Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th, had been on the will, I think that I could have seen it. I did not see it. As to the will signed Hal P. Shewmake, the paper might have covered his signature if it had been there, but I would not say the signature was there. I would not say that the signature was to either of these papers. I never saw the signature until after the death of the said Hal P. Shewmake. I had known him about eight or nine years before his

death. I knew him and had had business relations with him; knew him well. Had occasion to observe his manner and conduct, his talks and acts. At the time I attested these two papers Hal P. Shewmake was a man of sound mind, I think. Had never seen anything to indicate that he was not. All three of the subscribing witnesses subscribed their names in the presence of Hal P. Shewmake. I saw all three of the witnesses subscribe their names to these two documents. I stated that the documents on which the attestation clause of August 1, 1913, had a piece of paper concealing it. It came down to along there (indicating). Q. Now, did that paper go down far enough to conceal the signature of Hal P. Shewmake? A. Well, according to memory it cut off— I should think it came right across there (indicating). Q. What part, if any, of that writing under the first signature of H. P. Shewmake would you say was not there when you and the other two witnesses attested it? A. I did not see any of that; it wasn't there when I signed it. Q. What was on there when you signed it—"Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th,"—you say that part you don't think was there when you attested it? A. No, sir. Q. You don't mean to tell the jury that that signature was not there? A. I don't mean to tell them that one was not there. Q. I will get you to say whether or not the papers concealed that document on which the attestation clause is dated August 5th, 1913, came down far enough to cover the signature of Hal P. Shewmake, if the signature was there at that time. A. I think that it did. I won't say positively; it is just a question of memory. It came down so far, but how far I don't know. Q. You say that it came down half way of the attestation clause? A. I think it came down there; I don't think we could see all of the attestation clause. Q. Did the paper extend all the way across from the attestation clause to the other part of the paper? A. Yes, sir. Q. If there was any name to either one of these wills when you signed it, you didn't see it? A. No, sir, I did not see it.

A. H. Graham testified as follows: I signed the two papers purporting to be the last wills of Hal P. Shewmake, on one of which the attestation clause is dated August 1, 1913, and on the other it is dated August 5, 1913. Both were signed by me on the same

day. I signed them as attesting witness to his last will, at his request. He stated that he wanted me to sign. I signed as attesting witness. Mr. C. F. Ludwig signed both of these documents in my presence, and Mr. T. R. Ramsey signed both as attesting witnesses, and all three of us signed them in the presence of Mr. Hal P. Shewmake at his request. He wanted us to witness his will. I did not see him sign either of these papers. He did not sign the papers in our presence. There was a piece of blank paper over the face of each one, which dropped down about the same distance on each one. On the will dated August 1, 1913, if the signature of Hal P. Shewmake was there, the piece of paper came down far enough to conceal it. The piece of paper on the other will came down about the same distance. He brought it covered in that way. I did not see the signature of Hal P. Shewmake to either of these papers when I attested them as a subscribing witness. I do not mean to say that they were not there. I could not say positively the covering was over; it dropped down about that distance; there was nothing to the right that we could see, but so far as this attestation clause, there might possibly some of it have been seen, but it wasn't high enough to have seen all of it. I think that part of the attestation clause was visible. On the paper dated August 5, 1913, I think there was part of it visible. The paper had a cover on it, and it dropped down and covered most of it. My recollection is that a portion of the attestation clause was visible and a part concealed. I signed as subscribing witness because Mr. Shewmake asked me to do it. He stated that he wanted us to sign a will, and we went into Mr. Ludwig's office and signed these papers. I am quite sure that the signatures to his papers are his genuine signatures. I have seen his signatures a good many times. I have never been associated with his signatures enough to observe it so closely before, but I think it is just what I have over there in my office. When the three subscribing witnesses signed the documents he said it was his will. I have known him eight or nine years; had been associated with him a good many times. In my opinion he was of sound mind, so far as I can recall. I do mean to testify that Mr. Shewmake ever signed these papers. I said that he was of sound mind at the time I signed the papers, so far as I could tell. I do not know as a fact that he ever signed these papers. I never saw him sign the

same, and did not see his signature until after Mr. Shewmake's death. I never saw it until after the papers were filed in the court of ordinary. He never acknowledged his signature in our presence. All he said was, "This is my will." He never showed us his signature to the will or stated that this is my signature. The words "Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th," were not on the will when we signed it as witnesses. If they had been there, I could have seen them.

Thomas R. Ramsey testified as follows: I knew Mr. Hal P. Shewmake. He is dead. Died right after he signed that will. I signed these two documents, the attestation clause dated August 1, 1913, and the other attestation clause dated August 5, 1913, as attesting witness; signed both of them in the presence of Hal P. Shewmake. He saw me sign them. I saw the other two witnesses sign as attesting witnesses, and they signed in the presence of Hal P. Shewmake. He saw them sign. I did not see him sign the documents; and I did not see his signature on either of them when I signed. There was a piece of paper that covered the body of the will. The only place left was the attestation clause and our signatures. No writing was on the will at all, except this writing of Mr. Ludwig and Mr. Graham, when I signed it. I mean to say that the name of Hal P. Shewmake was not on the will when I signed it as a witness. If it had been there I could not see it. If it was there it was covered up under one of the documents. It was not there, because the paper came somewhere down here, and the other part couldn't have been on there. This part of it was not on there. (The part indicated by the witness as not being on the will was "Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th.") My best recollection about the attestation clause is that the paper came along about here (indicating), and none of the writing at all was there. I didn't see any of the writing at all. Q. Do you mean to tell the jury that the signature of Hal P. Shewmake was not on both of these instruments when you signed it? A. Not as I saw. I couldn't see it. I don't know how far the paper came down, but I know that the writing opposite our names and opposite on the attestation clause, dated August first, could not have been there, because I didn't see any writing at all. The sig-

nature did not come down opposite our names. I mean the signature "Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th." I do not know about the first signature; that depended on whether it was covered or not. If it came down below it, I know that these three or four lines along here could not have been there. My impression is that the paper came down to the attestation clause, but I could not say that. The covering on one could have possibly covered his signature if it covered a part of the attestation clause. I can't recollect whether it covered any part of the attestation clause. I was talking to Mr. Graham, and Mr. Shewmake walked over to Mr. Ludwig and spoke to him, and they called us over there, and we went back in the back part of the store. I don't remember whether Mr. Shewmake or Mr. Ludwig came up there and said he wanted us to witness a paper, and I walked back in the store and said, "I don't want to sign my death warrant," and Mr. Shewmake said it was his will he wanted me to witness. I signed the first paper, and he said the other paper was a subsequent will. He asked me to sign as witness to his will. I do not know the signature of Mr. Hal P. Shewmake. I have known him about seven or eight years; had ample opportunity to observe his manner and conduct and acts. At the time I signed these two instruments as the last will of Hal P. Shewmake he was of sound mind. Nobody was present when these documents were signed, except the witnesses and Mr. Shewmake. I never saw the name of Hal P. Shewmake to both of these papers until after his death, and first saw them in the court of ordinary after the papers had been filed there. I do not say that the name of Hal P. Shewmake was concealed under that paper at all. I did not say that it was there. There was a paper that covered them, but I do not know what it was. It may have just covered the space where that is. I could not say positively how far the paper came down. I do not think that the attestation clause was covered, but would not say positively. It may have covered some of it. I know that part of it was there, but I did not read it. I would not say the attestation clause was covered. I am positive that the words "Hal P. Shewmake, trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee," etc., were not there, because it could not have covered all of that, and I know

that was not there. I couldn't tell how far the paper came down on the attestation clause. If the signature of Hal P. Shewmake was on both of the instruments when I signed them, they were under the paper. I didn't see them.

Mrs. Dora Bell Shewmake, caveatrix, testified as follows: I have seen it before; my husband had it, Mr. Hal P. Shewmake. He had it up at our home, and I read it. He showed it to me in September of last year. His signature was not on this will when he showed it to me. The signature of the witnesses were, but his was not. When he showed it to me it was in September of last year. When he showed it to me he had several papers in his hand. I can't swear as to this one, but as to the other, that is the one signed by Hal P. Shewmake as trustee under authority of trust deed from M. A. Shewmake to H. P. Shewmake, trustee, dated February 14th. I saw the paper with the brown cover on it sometime in September. I can't remember the exact date, but it was before the fifteenth. This paper had the names of the witnesses at the time; had the name of the three witnesses. The signature of Hal P. Shewmake was not there. I have been married five years last July. My husband was buried in Augusta. Mr. Marshall Shewmake and Mr. Claude Shewmake took these two papers up to me and read them to me. I said to them that I hadn't seen a will, because when I saw it it was unsigned, and I didn't know an unsigned will was considered a will, and I didn't see a signed will. When my husband left my house he promised that he would not sign it. I don't remember what I said to these two gentlemen. I was nervous and agitated at the time. I said that he didn't have a will, because when he showed me these papers he promised he wouldn't sign them, and I did not know that an unsigned paper was considered a will. I didn't make any statement about the paper not having been signed when I saw it at all. I have never told any one except Mr. Hall in the last two or three weeks.

Claude Shewmake, testified: I first saw these two papers when I got them out of the safe and took them up to read to Mrs. Shewmake. I got them out of the safe of Shewmake-Hall Co., where I found them. I think it was about the third or fourth day after the funeral in Augusta, a day or two after Mrs. Shewmake returned from Augusta, that I found them, and I found both of them in the safe. Prior to that time I did not know that Hal P.

Shewmake had made a will. When we found these papers we took them to Mrs. Shewmake and didn't open them until we got in her presence. I read the two documents; and Mrs. Shewmake requested a second reading, she was so surprised and astounded at the contents. My brother Marshall went up there with me. She said that they cut her to the quick. I read both of them over to her twice. She did not make any statement as to whether she had seen these papers before. She said that she did not know that there was a will. She did not mention having seen these papers before the signature of her husband was on them. I am a beneficiary under the will, both of them. My brothers and I take the bulk of the property; take it all and give her $80.00 per month, and $300.00 insurance and $500.00 when she marries, and the rest of it goes to my two brothers and myself. These papers were at the store of my brother at Shewmake-Hall Co., in H. P. Shewmake's drawer.

Marshall Shewmake, testified: I am a brother of Hal P. Shewmake. I have seen the two documents. The first time that I ever saw them was when Mr. Hall and I were looking for the insurance papers of Shewmake-Hall Co. We looked through H. P. Shewmake's drawer and found these papers in there. Neither he nor I read the paper; we took it up and read it to Mrs. Shewmake, and that is the first time I ever heard of them. Prior to that time I did not know that he had a will. Never in his life had he discussed it with me. This is the second time I have ever seen them, I believe. My brother and I went up to Mrs. Shewmake's house and asked her if she preferred to go to the store or for us to go to the house, and she preferred going to the house. I opened the drawer myself; they were wrapped up and were not in any way touched until we got to the house, and opened in her presence. We found both documents when we opened the package. My brother Claude Shewmake read them to her, and she was surprised at the contents; she said that she had no idea of the will; she made no statement to us at all, and I was with her until my brother and I left the room together. I am a legatee under the will, just the same as my brothers. I have forgotten how many days after my brother's death it was before we took the papers up. I have forgotten how long Mrs. Shewmake stayed in Augusta. She came home one afternoon, I think on Tuesday, and we went the next

morning. We got into the drawer with a key that Mr. Hall had. We were looking for the insurance papers of Shewmake-Hall Co. We have a joint policy; we were looking for these papers and we could not find them; and he went up to Mrs. Broadhurst's and got the key from Mrs. Broadhurst. Mrs. Shewmake was not at home then. The bunch of keys that he got, the cash-drawer key was on them; we couldn't get in the cash-drawer, and Mr. Hall got it from Mrs. Broadhurst. My brother had had most of the keys to the little private drawers in the safe. I had a drawer, Mr. Hall had a drawer, and he had a drawer, and on this bunch of keys was the cash-drawer key, and we couldn't get in the cash-drawer and couldn't get in the other drawer to find these insurance papers.

S. T. Hall, testified: I was in business with Hal P. Shewmake. Two or three or four days after we got back from the burial . . we found these two documents in his private drawer. I do not know how long they had been there. I know the papers by what what was on the outside on the back. I do not know how long they had been there. Never looked at them at all, except the outside. We were hunting insurance policies, the copartnership life-insurance policies. They were Shewmake-Hall Company's papers.

The caveatrix recalled, testified: My husband, Hal P. Shewmake, had promised me that he would not sign the paper he showed me, was the reason that I expressed surprise.

*Hall & Roberts* and *Davis & Sturgis,* for plaintiff in error.

*Hines & Jordan* and *J. S. Adams,* contra.

BECK, J. 1. Exception is taken to the following charge of the court: "If you believe from the evidence that at the time Hal P. Shewmake, the testator, called upon the subscribing witnesses to attest their names, to sign the instrument as witnesses, that his name was at that time signed to the instrument as testator, then you would have to go further and determine whether or not the testator, Hal P. Shewmake, told the witnesses in effect, or, in other words, in effect acknowledged his signature to the instruments. If you believe that he did not, notwithstanding you may believe from the evidence that his name appeared at the time to the instruments; if you don't believe that he acknowledged his signature in the presence of these witnesses, you would be authorized under the law to find against the will." This charge was excepted to upon the ground that it was not a correct statement of the law,

and that it was without evidence to authorize it. While the charge may contain certain verbal inaccuracies, it is in substance a correct statement of the law as applied to the issues made in the case and the evidence submitted. One of the witnesses testified that the testator, when Mr. Ramsey, one of the attesting witnesses, remarked that he did not know what he was signing—that he hoped it was not his death warrant, said, "No, it is my will," and that he made that declaration in the presence of the three witnesses. In the case of *Webb* v. *Fleming,* 30 *Ga.* 808 (76 Am. D. 675), it is said: "A testator's acknowledgment of his signature in the presence of the subscribing witnesses is sufficient, without the signing being done in their presence." And in the body of the opinion it was said: "The evidence is, that he [the testator] did sign it [the will] in the presence of the witness, Martin, and that, by his conduct, he clearly acknowledged his signature in the presence of each of the other two. And that was sufficient." In that case it will be observed, from reading the statement of facts, that the conduct which was held to amount to an acknowledgment of the signature was about the same as the conduct which it is claimed in the present case amounted to an acknowledgment of the signature; that is, the testator, in the case from which the quotation is taken, said, "Yes, this is my will; it is written as I want it; I want you to witness it." And there appears the further statement that "Sanders [the testator] did not sign or say he had signed it in witnesses' presence." See also the case of *Beall* v. *Mann,* 5 *Ga.* 456.

2. A similar exception to the one just dealt with is taken to the following charge of the court: "If you believe that the testator's name was signed to the instruments at the time he procured the witnesses to sign as witnesses, and you believe further that the testator, Hal P. Shewmake, told the witnesses, or that he acknowledged his signature in their presence, why then you would be authorized to find in favor of the will." There being evidence in the record, as pointed out in dealing with the ground of the motion considered in the preceding division of this opinion, that the alleged testator had said of the paper offered for probate, "it is my will," and in view of the authorities cited above, dealing with a similar situation, this exception is without merit.

3. Another ground of the motion complains of the following charge of the court: "It is not necessary for the testator actually

to sign the will in the presence of the subscribing witnesses, but any acknowledgment before them of his signature to the instrument makes their attestation and subscription complete, and a due acknowledgment in fact does not necessarily require the use of the words that 'this is my signature,' or other equivalent expression; provided the testator's conduct was such as to amount to, in common understanding, any reasonable construction to the acknowledgment of his signature to the instrument, although the witnesses didn't see the signature." In the case of *Beall* v. *Mann,* supra, it was said: "In the case of Gryle *vs.* Gryle, 1 Ves. Jr. 11, Lord Hardwick doubted whether it was a sufficient execution, and publication of a will, for the testator to say before the witnesses, 'this is my will,' without some further act on his part. But those doubts have long since vanished, and modern adjudications have gone to the extent of deciding that a will is duly executed and published, though the witnesses neither saw the testator's signature nor were made acquainted with the instrument they attested, provided they were requested by the testator to subscribe the memorandum of attestation. British Museum *vs.* White, 3 M. and Pay. 689. S. C. 6 Bingh. 310. Wright *vs.* Wright, 5 M. & P. 316. S. C. 7 Bingh. 457. Johnson *vs.* Johnson, 1 Cromp. and Mees. 140." We think that this ruling is authority for the proposition contained in the judge's charge. While the charge as given may contain some verbal inaccuracies, in substance it instructs the jury that it is not necessary for the testator actually to sign the instrument in the presence of the witnesses, and that any acknowledgment before them of his signature to the instrument is sufficient, and that the "due acknowledgment" need not be embodied in any particular verbal formula, but it may be inferred from conduct which amounts to an acknowledgment of the signature, although the witnesses did not see the signature. Of course it is essential to the validity of the will that the signature should have been there at the time of the subscription of their names by the attesting witnesses; and the judge correctly and clearly instructed the jury to this effect. In the same connection see the case of *Webb* v. *Fleming,* supra; *Thompson* v. *Davitte,* 59 *Ga.* 472 (8); Dewey *v.* Dewey, 1 Met. (Mass.) 349 (35 Am. Dec. 367).

4. Another charge of the court excepted to is as follows: "A full and complete attestation clause properly signed is prima facie

evidence of the due execution of the will, and has the effect of shifting the burden of proof to those who deny the proper execution of the instrument or the will." It might appear at first blush that the language of this charge was entirely too broad; but it will be observed that the judge in this part of his charge is dealing exclusively with proof of the execution of the will, and not with the burden generally which rests upon propounders, where the issue is made of devisavit vel non. And, viewed as instructions touching the execution merely of the will, the charge is not error. The attestation clause was as follows: "Signed and sealed by the testator; we in his presence and at his request, and in the presence of each other, have hereunto subscribed our names and attested the same as witnesses, this 1st day of August, 1913." While possibly this attestation clause is a little unusual in form, it has all the elements of a full and complete attestation clause. And that being true, as just ruled, there was no error in the charge. "A full and complete attestation clause properly signed is prima facie evidence of the due execution of the will, and has the effect of shifting the burden of proof to those who deny the proper execution of the will." 14 Enc. Ev. 407. And it is said in the case of *Underwood* v. *Thurman*, 111 *Ga.* 325 (36 S. E. 788): "When the attestation clause to such an instrument recites all the facts essential to its due execution as a will, and it is shown that the alleged testator and those whose names appear thereon as witnesses actually affixed their signatures to the paper, a presumption arises that it was executed in the manner prescribed by law for the execution of wills; and this is so though there may be on the part of one or more of the witnesses a total failure of memory as to some or all of the circumstances attending the execution." In the opinion in the case last cited the following is quoted approvingly from Schouler on Wills: "The advantage of an attestation clause with suitable recitals is shown in many of our decisions relating to the proof of wills. Where, indeed, there is nothing but a formal attestation clause on one side, and the testimony decidedly adverse of both subscribing witnesses on the other, probate of a will has been refused. But, with the aid of a proper attestation clause to contradict such persons, or possibly without it, wills have been established in proof, against the concurring statements of both subscribing witnesses or the statement of either that the legal requirements of execution

were not fully complied with." And in the opinion it was said: "In *Deupree* v. *Deupree,* 45 *Ga.* 415, a majority of the court, at the January term, 1872, held that under the circumstances of that case a presumption of the due execution of a paper, testamentary in character and shown to have been signed by the alleged testator, arose from an attestation clause which did not recite that the witnesses signed in the presence of the testator; and all the members of the court agreed that if the attestation clause had so recited, it would, when the signatures of the testator and the witnesses were proved, have raised a presumption of law that the paper was duly attested as a will. Nothing to the contrary was laid down in this case when it was again here at the July term, 1873 (49 *Ga.* 325); nor has this court, so far as we have been able to ascertain, ever held that a presumption of due execution did not arise in such a case as the one now before it."

5. The court did not err in admitting in evidence copies of the papers offered as the will, over the objection that the execution of the will had not been proved. Under the facts of the case the court properly admitted evidence tending to show the genuineness of the testator's signature to the will. *Gillis* v. *Gillis,* 96 *Ga.* 1 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 21).

*Judgment affirmed. Fish, C. J., absent. Atkinson and Hill, JJ., dissent. The other Justices concur.*

ON MOTION FOR REHEARING.

BECK, J. The act of 29 Car. c. 3, commonly called the statute of frauds, the fifth section of which made provision in regard to wills, is set out in Cobb's Dig. 1128, as follows: "All devises and bequests of any lands, or tenements, devisable either by force of the statute of wills, or by this statute, or by force of the custom of Kent, or by the force of the custom of any borough, or any other particular custom, shall be in writing, and signed by the party so devising the same, or by some other person in his presence, and by his express directions, and shall be attested and subscribed in the presence of the said devisor by three or four credible witnesses, or else they shall be utterly void, and of none effect." By the 19th section thereof provision was made in regard to nuncupative wills. By the act of 1852 (Acts 1851-2, p. 104), wills disposing of personalty were required to be executed and proved in the same manner as previously required in regard to devises of real estate.

Under the language of this statute it was held that the witnesses need not see the testator sign, but that his acknowledgment to each that the instrument was his was sufficient. In 1837, in England, a statute was passed changing the rule thus laid down by the authorities. 1 Vic. c. 26, sec. 9. This required that the will should be signed at the foot or end of it by the testator, or by some other person in his presence and by his direction, and that such signature should be made or acknowledged by the testator in the presence of two or more witnesses present at the same time, and that such witnesses should attest and subscribe the will in the presence of the testator. By this statute it was the signature which was required to be acknowledged, and not the instrument only, as had previously been the rule. Under this statute a different rule of construction arose. In Dewey v. Dewey, 1 Metcalf, 349 (35 Am. D. 367), the English rule was considered, and it was held, that the will need not be signed by the testator in the presence of the attesting witnesses; that it was sufficient that he acknowledged his signature and requested them to act as its witnesses, or that he merely declared to them that the paper was his will. In the opinion it was said: "The signature of the testator is admitted to be a genuine signature, and the certificate of attestation assumes that it had been already signed. The purpose of procuring the attestation of the witnesses was to give effect to the instrument as a valid will. It can hardly be supposed that the testator, who was by his own active agency procuring the authentication of the instrument by the requisite witnesses, would have omitted the first step necessary to its due execution, viz., the signature by himself."

In a number of the American States the statutes require that the testator must sign or subscribe the will in the presence of the witnesses, or that he may acknowledge his signature or subscription in their presence. Under some of them also the witnesses need not be present at the same time, provided that the testator signs cr acknowledges his signature before each one of them. Under such statutes it is more commonly held that if the witnesses do not see the testator sign or see his signature which has been affixed, or do not have opportunity so to do, the execution of the will is invalid. In some States a will may be upheld although the witnesses neither saw the testator sign nor saw his signature. Dougherty v. Crandall, 168 Mich. 281 (134 N. W. 24, 38 L. R. A. (N. S.) 161, and note, Ann. Cas. 1913B, 1300).

The common-law rule appears to have been recognized in this State prior to the adoption of the original code. *Beall* v. *Mann,* 5 *Ga.* 456. It was there said: "In the case of Gryle *vs.* Gryle, 1 Ves. Jr. 11, Lord Hardwick doubted whether it was a sufficient execution, and publication of a will, for the testator to say before the witnesses, 'this is my will,' without some further act on his part. But those doubts have long since vanished, and modern adjudications have gone to the extent of deciding that a will is duly executed and published, though the witnesses neither saw the testator's signature, nor were made acquainted with the instrument they attested, provided they were requested by the testator to subscribe the memorandum of attestation. British Museum *vs.* White, 3 M, and Pay. 689. S. C. 6 Bingh. 310. Wright *vs.* Wright, 5 M. and P. 316. S. C. 7 Bingh. 457. Johnson *vs.* Johnson, 1 Cromp. and Mees. 140."

As originally codified (Code of 1863, § 2383) the law in regard to the execution of wills was declared as follows: "All wills (except nuncupative wills), disposing of realty or personalty, must be in writing, signed by the party making the same, or by some other person in his presence, and by his express directions, and shall be attested and subscribed in the presence of the testator by three or more competent witnesses." Section 2387 read as follows: "In all cases a knowledge of the contents of the paper by the testator is necessary to its validity; but usually where a testator can read and write, his signature, or the acknowledgement of his signature, is sufficient. If, however, the scrivener or his immediate relations are large beneficiaries under the will, greater proof will be necessary to show a knowledge of the contents by the testator."

The two sections are now included in the Code of 1910 as §§ 3846, 3850: the first, under the caption, "Formalities of Execution;" the second, under the head, "Knowledge of Contents." In adopting substantially the English statute of frauds on the subject of necessary formalities in the execution of wills, we will follow the construction placed by the English courts upon that statute prior to our adopting act of 1784. *Brown* v. *Burke,* 22 *Ga.* 574 (3). See also *Thornton* v. *Lane,* 11 *Ga.* 459 (4), 500; *Tucker* v. *Adams,* 14 *Ga.* 548, 569; *Thrower* v. *State,* 117 *Ga.* 753, 757 (45 S. E. 126).

After these provisions had thus been codified, the decision in

*Webb* v. *Fleming,* 30 *Ga.* 808 (76 Am. D. 675), was rendered. In the opinion it was said: "To determine whether or not this verdict is supported by the evidence, the evidence must be applied to the different issues presented by the different grounds of caveat. The first ground is, that the testator did not sign the will in the presence of the witnesses. The evidence is that he did sign in the presence of the witness Martin, and that by his conduct he clearly acknowledged his signature in the presence of each of the other two. And that was sufficient." From the statement of facts it appears that the following were the acts thus held to be a sufficient acknowledgment in the presence of the other two: "Hutchins [one of the attesting witnesses] approached the bed and said to Sanders [the testator]: 'Mark, Tom is here to attend to that business.' Sanders said, 'Yes, this is my will; it is written as I want it; I want you to witness it.' He [the attesting witness] then subscribed the paper in the presence of Sanders; Sanders did not sign or say he had signed it in witnesses' presence." See also *Gillis* v. *Gillis,* 96 *Ga.* 1 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 21), and cases there cited. Still later was decided the case of *Underwood* v. *Thurman,* 111 *Ga.* 325 (36 S. E. 788), from which is taken the quotation appearing in the fourth division of the original opinion. See also, in this connection, Hobart v. Hobart, 154 Ill. 610 (39 N. E. 581, 45 Am. St. R. 151).

From what has been said it will be seen that the English construction of the statute of frauds established a rule as to what was a sufficient acknowledgment of the instrument; that the statute of frauds in regard to the formalities of execution of the will was the law of Georgia prior to the adoption of the code in this State; that it was adopted in the code with no substantial change except as to the inclusion of a will of personal property on the same basis as a devise of realty, and as to the mentioning of the execution of nuncupative wills, for which provision was elsewhere made. It will further be seen that there is nothing in the decisions of this State adopting a different ruling since the code took effect, but that the same line of reasoning has been pursued consistently. The only place where reference is made to the acknowledgment of the signature is in section 3850 of the Code of 1910, which deals with knowledge of the contents of the will by the testator, and declares that where he "can read and write, his signature, or the acknowl-

edgment of his signature, is sufficient." This section was not dealing with the question of the necessary formality of execution of the will, but with the question of what would be sufficient to imply knowledge of the contents of the instrument on the part of the person executing it. And we can not import from a section of the code, not taken from a statute but codified from the general law and dealing with the knowledge of the contents of the instrument, the words "acknowledgment of his signature," and insert them into another section dealing with the necessary formalities of the execution or treat them as modifying the last-mentioned section, so as to change the established rule of construction on the subject of such necessary formalities.

There was some evidence for the consideration of the jury, tending to show that the signature appended to the instrument when offered for probate was the genuine signature of the testator. From the discussion above it will be seen that the rule adopted in this State is to the effect that the acknowledgment by the testator in the presence of the attesting witnesses that the instrument is his will carries an implication that he has signed it, and that the signatures of the attesting witnesses, with an attesting clause reciting that the paper was signed and sealed by the testator and attested by them, carries the probative force that the will has been regularly executed. If in fact the instrument had not been signed by the testator or by some other person in his presence and by his express direction before it was attested by the witnesses, it would not be a will, because a testamentary paper does not become a will until it is signed, and the witnessing of an unsigned paper would not suffice. But while this is true, we are of the opinion that under the evidence, and especially in view of the facts above mentioned, the question was for the jury whether the signature of the paper appended thereto at the time it was offered for probate was that of the purported testator, and, if so, whether in fact it was upon the paper at the time when the attestation was made or not; and we can not declare that there was no evidence which would authorize the jury to find in favor of the probate of the will.　　　　　　　　　　　　　　*Rehearing denied.*

ATKINSON and HILL, JJ., dissenting. The burden was upon the propounder to prove the factum of the will. *Slaughter* v. *Heath,* 127 *Ga.* 747 (57 S. E. 69, 27 L. R. A. (N. S.) 1). Factum

of the will involved, among other things, signature by the maker, or by some other person in his presence and by his express direction, before the instrument was signed by the attesting witnesses. Civil Code, § 3846. Under former decisions of this court, if the testator signed the paper out of the presence of the attesting witnesses and afterwards acknowledged to them that he signed it and requested them to attest it as his will, such acknowledgment would be a sufficient substitute for actual signing by the testator in the presence of the witnesses. It appears from the evidence set out in the statement of facts that the attesting clause did not recite that the paper was signed by the maker in the presence of the witnesses at or before the time they signed it, or that he acknowledged having signed it to them. It affirmatively appears that none of the subscribing witnesses were absent, but that all were present at the trial and testified. According to the testimony of each of them the maker did not sign the paper in their presence, nor did they see the maker's name signed to the paper at the time they signed it, nor did they testify to any loss of memory on that subject. They all declined to testify that the maker's name was or was not signed to the paper; each stated that he did not know. The caveatrix testified that she saw the paper after it was signed by the witnesses, and that when so seen by her it was not signed by the maker. When the above is considered, the evidence in its entirety was insufficient to establish the factum of the will; and being so, the charge on which error was assigned was unauthorized, and the verdict was unsupported by the evidence.